Terri Lee HALDERMAN et al., Plaintiffs,

v.

PENNHURST STATE SCHOOL AND HOSPITAL et al., Defendants,

United States of America, Plaintiff-Intervenor,

Pennsylvania Association for Retarded Citizens et al., Plaintiffs-Intervenors.

Civ. A. No. 74–1345.

United States District Court, E. D. Pennsylvania.

Aug. 5, 1981.

See also D.C. 451 F.Supp. 233.

David Ferleger, Philadelphia, Pa., for Terri Lee Halderman.

Thomas M. Kittredge, Philadelphia, Pa., for Bucks, Chester and Delaware Counties.

Robert B. Hoffman, Deputy Atty. Gen., Harrisburg, Pa., for the Commonwealth of Pennsylvania.

Thomas Gilhool, Philadelphia, Pa., for Pennsylvania Association for Retarded Citizens.

Herbert B. Newberg, Philadelphia, Pa., for David Ferleger, Esq.

Pamela P. Cohen, Philadelphia, Pa., for Pennhurst Parents Association.

Adjor A. Burrow, Civil Rights Div., Dept. of Justice, Washington, D. C., R. Stephen Barrett, Asst. County Sol., Norristown, Pa., for Montgomery County.

Marc H. Myers, Asst. City Sol., Philadelphia, Pa., for Philadelphia County.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Again, the defendants in this case have petitioned for a stay of this Court's remedial Orders pending decision by the Court of Appeals on remand from the Supreme Court. This is the fourth time defendants have asked this Court to stay its Orders. In each instance the request for a stay has been denied. On seven occasions the Court of Appeals and the Supreme Court have likewise refused to stay the basic thrust of this Court's Orders pending disposition of appeals. A review of this litigation makes it obvious why stays have been consistently denied in the past and why the instant motion to stay will be denied.

In 1977 this Court, after 32 trial days, determined that not only were the constitutional rights of the retarded residents of Pennhurst being violated, but that their rights under both state and federal statutes were also violated. As the trial record in this case reveals, all parties to this litigation admitted that the residents of Pennhurst were not receiving minimally adequate habilitation. By "adequate habilitation" we mean such education, training and care as will better enable a retarded person to cope

with life as effectively as his or her capacities will permit. The average stay of a resident at Pennhurst was 21 years, and the testimony showed that a majority of them had regressed in that their level of functioning had declined when compared to the skills which they possessed at the time of admittance to Pennhurst. On many occasions since the trial, including the oral argument on this motion, all parties were in agreement with the many experts who testified at the trial that normalization is now universally accepted as the most beneficial method of habilitating a retarded person. Normalization is the antithesis of institutionalization and is based upon the fact that the education, training and care of a retarded person can best be accomplished in a community living arrangement. As this Court found, Pennhurst as an institution is inappropriate and inadequate as a place to habilitate the retarded. At the trial the Commonwealth represented that it intended to close Pennhurst in the early 1980's.

Approximately 3% of our population is retarded to some degree. However, 89% of those classified as retarded are only mildly retarded and are capable of achieving self-support and self-care; the remainder of the retarded are capable of achieving some degree of self-care. Once again this Court points out that when it speaks of the retarded it means individuals who are impaired in learning capacity and adaptive behavior, persons who have not broken the law and who are not a danger to the community because of some severe mental or emotional disorder.

The defendants take the position that a stay should be granted at this time in view of the fact that the United States Supreme Court on April 20, 1981 held that § 6010 of the Developmentally Disabled Assistance and Bill of Rights Act does not create any substantive rights for retarded individuals. 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). However, this Court's remedial Orders were not based upon a violation of the Developmentally Disabled Assistance and Bill of Rights Act. The remedial

Orders which the defendants desire to stay were based upon this Court's findings of fact and conclusions of law which can be summarized as follows:

1. When a state involuntarily commits a retarded person it must provide that person with habilitation that will afford him or her a reasonable opportunity to acquire such skills as his or her capabilities permit, and that due process requires that when a state undertakes the habilitation of a retarded person it must do so in the least restrictive setting consistent with his or her habilitative needs.

2. Because the retarded persons at Pennhurst were physically abused their constitutional right to be free from harm has been violated.

3. That all retarded persons have a constitutional right to non-discriminatory habilitation and that the retarded residents of Pennhurst are being segregated by institutionalizing them in a place that is not only separate and apart but is a place denying the retarded their equal right to education and training.

4. A Pennsylvania statute (50 P.S. § 4201) creates for each retarded individual a statutory right to minimally adequate habilitation.

5. Section 504 of the Rehabilitation Act of 1973 creates for each retarded person a federal statutory right to minimally adequate habilitation in a non-discriminatory setting such as a community living arrangement.

The concept of community living arrangements for the retarded was not conceived by this Court. In November of 1970 the Commonwealth of Pennsylvania enacted Act 256 which appropriated $21,000,000 to construct or otherwise provide community living arrangements for 900 Pennhurst residents. At the time this case was tried in 1977, 7 years later, only 37 Pennhurst residents had directly benefited from that appropriation. It is of interest to note that on the basis of the testimony presented at the trial the Court found that community living arrangements are less expensive to operate than large institutions such as Pennhurst.

On July 1, 1981, this Court held a hearing in connection with the instant motion to stay this Court's remedial Orders pending decision by the Court of Appeals on remand from the Supreme Court.

■ Federal Rule of Civil Procedure 62(c) provides in pertinent part:

When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party.

It is well settled by the case law that a party seeking the stay of a judgment order must show (1) that it will likely prevail on the merits of the appeal, (2) that it will suffer irreparable injury if the stay is denied, (3) that other parties will not be substantially harmed by the stay, and (4) that the public interest will be served by granting the stay. *Long v. Robinson,* 432 F.2d 977, 979 (4th Cir. 1970); *Philadelphia Council of Neighborhood Organizations v. Adams,* 451 F.Supp. 114, 116 (E.D.Pa.1978); *Resident Advisory Board v. Rizzo,* 429 F.Supp. 222, 224 (E.D.Pa.1977). A motion requesting a stay of a judgment order is addressed to the discretion of the Court. The Third Circuit has stated that in considering the four-prong test enumerated above, the district court should be aware that

these [four] factors structure the inquiry, however, no one aspect will necessarily determine its outcome. Rather, proper judgment entails a "delicate balancing" of all elements.

*Constructors Association of Western Pennsylvania v. Kreps,* 573 F.2d 811, 815 (3d Cir. 1978). *See, Evans v. Buchanan,* 424 F.Supp. 875, 879 (D.Del.1976).

## 1. *Likelihood of Success on Appeal*

■ Defendants contend that the recent decision of the Supreme Court in this case holding that § 6010 of the Developmentally Disabled Assistance and Bill of Rights Act does not confer on the retarded any enforceable rights and remanding the case to the Court of Appeals, implies a negative view as to the constitutional and statutory grounds which formed the basis for this Court's opinion. The Supreme Court in remanding to our Third Circuit Court of Appeals specifically directed that the Circuit Court address (1) the federal constitutional claims, (2) claims under § 504 of the Rehabilitation Act of 1973, and (3) claims under the Pennsylvania statute (50 P.S. § 4201). These are the grounds upon which this Court bottomed its judgment that the defendants must provide appropriate and safe community living arrangements for the retarded residents of Pennhurst. Since this Court made its findings of fact and conclusions of law in 1977, our Court of Appeals has determined that the retarded have a right to minimally adequate habilitation. *Romeo v. Youngberg*, 644 F.2d 147 (3d Cir. 1980), *cert. granted*, 451 U.S. 982, 101 S.Ct. 2313, 68 L.Ed.2d 838 (1981). Furthermore the Supreme Court of Pennsylvania has determined that the statutory law of Pennsylvania also gives the retarded a right to minimally adequate habilitation. *In Re Joseph Schmidt*, 494 Pa. 86, 429 A.2d 631 (1981). In addition, in *Lynch v. Maher*, 507 F.Supp. 1268 (D.Conn.1981), the court held that section 504 of the Rehabilitation Act of 1973 prohibits the unnecessary separation and isolation of handicapped people. The defendants have not shown that they have a "likelihood of success on appeal."

## 2. *Irreparable Injury to Commonwealth Defendants*

The Commonwealth contends that failure to stay this Court's Orders will cause irreparable injury to it in that compliance will require the expenditure of vast sums of money. In view of the testimony given by Commonwealth witnesses at trial that the Commonwealth intended to move all the retarded residents from Pennhurst into community facilities by the early 1980's, the Commonwealth's contention that the Court's Orders requiring this to be done will cause irreparable harm is unpersuasive. As the Court found in its opinion of December 23, 1977:

Having concluded the trial phase of the liability portion of this litigation, it has become apparent that by and large the parties share the same goals: all desire to improve the education, training and care provided the retarded in Pennsylvania and believe that Pennhurst should be closed and that all residents should be educated, trained and cared for in the community. All agree that institutions such as Pennhurst are inappropriate and inadequate for the habilitation of the retarded. Defendants agree with plaintiffs' contention that the habilitation provided Pennhurst residents does not meet minimally acceptable professional standards.

*Halderman v. Pennhurst State School & Hospital*, 446 F.Supp. 1295, 1313 (E.D.Pa. 1977). At the hearing on the instant motion for stay of this Court's Orders, the Deputy Attorney General reiterated the Commonwealth's policy in favor of deinstitutionalization of the retarded.

The argument that the cost of compliance with the Court's Orders will cause irreparable injury to the Commonwealth loses all credibility in light of the Court's finding that providing habilitative services for the retarded in the community is less expensive than operating a large isolated institution like Pennhurst. As the Court found in its opinion of December 23, 1977:

Comparable facilities in the community are generally less expensive than large isolated state institutions.... Moreover, keeping the retarded individual in the community makes it possible for him or her to get employment. Eighty-five percent of the mentally retarded can be employed, though not all are capable of competitive employment. The lifetime earnings of a mildly retarded individual often exceeds $500,000. For those with an I.Q. between 25 and 50, 45% of men and 12%

of women earn about 20% of the average wage. When the retarded can work, the amount of financial support which society must provide decreases and the individuals may benefit society with the taxes they pay.

*Halderman v. Pennhurst, supra,* at 1312.

The Commonwealth also contends that there is no further need for continued oversight by this Court or its Masters of defendants' community placement programs or of the operation of Pennhurst. However, as this Court found in its Memorandum of March 2, 1981:

> Contrary to this Court's hopes and expectations, the movement of Pennhurst residents to appropriate community residences has almost come to a standstill. The degree of implementation which the Court was told that the defendants would produce without a specific implementation order has unfortunately not been forthcoming. The Court, therefore, must resort to an implementation Order pursuant to which compliance will be measured. In its order of implementation this Court will direct defendants to provide suitable community living arrangements and services for specified numbers of Pennhurst residents and other retarded persons in the plaintiff class during the remainder of the current fiscal year and in the next fiscal year.

> The entry of an implementation order is necessary at this time. The defendants cannot be permitted to further delay providing the retarded members of the plaintiff class their right to adequate habilitation in a community living arrangement.

*Halderman v. Pennhurst,* No. 74–1345, slip op. at 8–9 (March 2, 1981). It is apparent now, as it was apparent when this Court issued its Order of March 2, 1981, that if the rights of the retarded residents of Pennhurst to live in safe and beneficial community living arrangements are to be implemented, the Masters' Offices are necessary to monitor compliance with this Court's Orders. Denying a stay will not irreparably injure the defendants.

### 3. *Injury to Plaintiffs from a Stay*

As the Court's opinion of December 23, 1977 demonstrates, the retarded residents of Pennhurst have endured severe and widespread deprivations of their constitutional and statutory rights—deprivations which continue to this day. As the Supreme Court noted in its opinion in this case, this Court's "findings of fact are undisputed: Conditions at Pennhurst are not only dangerous, with the residents often physically abused or drugged by staff members, but inadequate for the 'habilitation' of the retarded. Indeed, the court found that the physical, intellectual and emotional skills of some residents have deteriorated at Pennhurst." *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 7, 101 S.Ct. 1531, 1534, 67 L.Ed.2d 694 (1981). This Court's Orders are intended to alleviate these deprivations. A stay would result in further irreparable injury to the plaintiffs.

### 4. *Public Interest*

The public interest will not be served by a stay of this Court's Orders. The public interest will never benefit from a failure to provide minimally adequate habilitation to its retarded citizens. This Court's Orders represent nothing more than a judicial recognition that the retarded have constitutional and statutory rights which must not be denied.

Having carefully considered all the contentions of the defendants, we shall enter an Order denying the defendants' motion requesting a stay of this Court's Orders of April 24, 1980, May 28, 1980, and July 14, 1980.