Terri Lee HALDERMAN, et al.

v.

PENNHURST STATE SCHOOL AND HOSPITAL, et al.

Civ. A. No. 74–1345.

United States District Court, E.D. Pennsylvania.

April 5, 1985.

---

**1222**

David Ferleger, Philadelphia, Pa., for · plaintiffs.

Mitchell W. Dale, Lawrence Goldberg, Washington, D.C., for U.S.A.

Thomas K. Gilhool, Frank Laski, Philadelphia, Pa., for PARC.

Sandra Swenson, Pamela Cohen, Philadelphia, Pa., for Pennhurst Parents-Staff Ass'n.

Allen C. Warshaw, Harrisburg, Pa., for Com. of Pa.

James M. McNamara, Doylestown, Pa., for Bucks County.

Thomas M. Kittredge, Philadelphia, Pa., for Chester, Bucks, Delaware and Montgomery Counties.

Patricia H. Jenkins, Media, Pa., for Delaware County.

R. Stephen Barrett, Norristown, Pa., for Montgomery County.

Mark A. Aronchick, Pauline Cohen, Richard Gold, Philadelphia, Pa., for Philadelphia County.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

No one, and certainly not this Court, anticipated that this civil action commenced on May 30, 1974 would be actively litigated for more than ten years, requiring 2,192 docket entries, about 500 Court orders, twenty-eight published opinions, and three arguments before the U.S. Supreme Court. *See* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed. 2d 694 (1981); 707 F.2d 702 (3d Cir.1983); 673 F.2d 645 (3d Cir.1982) (en banc); 673 F.2d 647 (3d Cir.1982) (en banc); 612 F.2d 84 (3d Cir.1979) (en banc); 612 F.2d 131 (3d Cir. 1979) (en banc); 566 F.Supp. 185 (E.D.Pa. 1983); 97 F.R.D. 522 (E.D.Pa.1983); 555 F.Supp. 835 (E.D.Pa.1983); 555 F.Supp. 1144 (E.D.Pa.1982); 555 F.Supp. 1142 (E.D. Pa.1982); 555 F.Supp. 1138 (E.D.Pa.1982); 559 F.Supp. 153 (E.D.Pa.1982); 96 F.R.D. 60 (E.D.Pa.1982); 545 F.Supp. 410 (E.D.Pa. 1982); 542 F.Supp. 619 (E.D.Pa.1982); 536 F.Supp. 522 (E.D.Pa.1982); 533 F.Supp. 649 (E.D.Pa.1982); 533 F.Supp. 641 (E.D.Pa. 1982); 526 F.Supp. 428 (E.D.Pa.1981); 526 F.Supp. 423 (E.D.Pa.1981); 526 F.Supp. 414 (E.D.Pa.1981); 526 F.Supp. 631 (E.D.Pa. 1981); 526 F.Supp. 409 (E.D.Pa.1981); 452 F.Supp. 867 (E.D.Pa.1978); 451 F.Supp. 233 (E.D.Pa.1978); 446 F.Supp. 1295 (E.D.Pa. 1977).

The concluding chapter of this litigation is at hand. The Final Settlement Agreement is now before this Court for approval. As with all settlement agreements, this settlement is a creature of compromise. As with all things of this world, the settlement is not perfect. It is, however, a fair, adequate, and reasonable settlement, which will protect the rights and well-being of all the mentally retarded persons who resided at Pennhurst on and after May 30, 1974, as well as all retarded persons on the Pennhurst waiting list as of that date who have

received habilitative services in the community pursuant to prior orders of this Court.

It has taken eleven years of litigation to produce this settlement. It is ironic that when this action was tried in 1977, all parties agreed that Pennhurst as an institution was inappropriate and inadequate for the habilitation of mentally retarded persons. (Habilitation is a term of art which refers to the education, training, and care which will enable a retarded person to reach his or her maximum potential.) During the course of the trial, no one took issue with the many professionals in the field of mental retardation who testified that "normalization" has been universally accepted as the only successful method of habilitating a retarded person. Normalization, as the term implies, is the antithesis of institutionalization. The basic principle of normalization is that a retarded person must be cared for, trained and educated in a normal community environment.

Mental retardation is an impairment in learning capacity and adaptive behavior. It has been estimated that about three percent of the population in the United States may be classified as "mentally retarded." However, the overwhelming majority of that three percent are only "mildly" retarded, and are capable of achieving self-support, while the remainder are capable of achieving some degree of self care. As pointed out by the United States Supreme Court in *Kremens v. Bartley,* 431 U.S. 119, 135, 97 S.Ct. 1709, 1718, 52 L.Ed.2d 184 (1977), careful attention must be paid to the differences between mental illness and mental retardation. There is no question that mental illness and mental retardation are separate and distinct conditions which require different types of treatment. Although retardation is wholly distinct from mental illness, retarded individuals, just as other members of society, often suffer from mental and emotional illness. Mental retardation is not a disease which can be cured through drugs or treatment. However, with proper habilitation, the level of functioning of every retarded person may be improved.

■ Throughout history, retarded individuals have been mistreated, and their dire need for treatment, education and training has been ignored. Wolfensberger, *The Origin and Nature of Our Institutional Models* 3 (1975). Retardation is not a violation of the law. Being mentally retarded does not make juveniles or adults dangerous to society. Mentally retarded persons are individuals who, because of circumstances beyond their control, are unable to function at the same levels as others in society. They do require specialized education, training and care. They do have a constitutional right under the Equal Protection Clause of the Fourteenth Amendment to receive as much education and training as is provided by the government to those whom society considers as "not retarded." *Pennsylvania Association for Retarded Children v. Commonwealth of Pennsylvania,* 343 F.Supp. 279 (E.D.Pa. 1972). In this case the Court was faced with a situation where retarded members of our society had been "incarcerated" in an institution. These retarded citizens had not violated any laws and, with very few exceptions, were not dangerous to society. Their only need was for care, education, and training.

Pennhurst, a residential institution for retarded persons, was founded in 1908. It is owned and operated by the Commonwealth of Pennsylvania, and is located in Spring City, Pennsylvania, about 30 miles from Philadelphia. At the time of the trial of this case in 1977, the resident population was approximately 1,230, reduced from a high of nearly 4,000 in the early 1960s. The Pennhurst staff numbered approximately 1,500. All parties conceded at trial that the institution had undergone tremendous improvement since the 1950s when, at best, the treatment of the residents could be described as "warehousing." Even with these improvements, however, the defendants admitted that Pennhurst did not meet the professionally accepted minimum standards for the habilitation of its retarded residents. Despite these admissions, the defendants insisted that no constitutional or statutory rights of the residents were

being violated. The years of litigation have, however, brought about an awareness that a retarded person does have a right to minimally adequate habilitation in the least restrictive setting.

*History of the Litigation*

As is well-known to the litigants, this case began in 1974 as a class action in which the named plaintiffs, retarded persons (the "Pennhurst Class") who were either residents of Pennhurst State School and Hospital or on the waiting list for residence at Pennhurst as of May 30, 1974, claimed injury based on violations of certain state and federal statutes and the United States Constitution. At trial, all parties agreed that Pennhurst as an institution was inappropriate and inadequate for the habilitation of mentally retarded citizens, and that retarded persons should be educated, trained, and cared for in community living arrangements. However, the defendants insisted that they be permitted to accomplish the community placement of Pennhurst residents and the closing of Pennhurst at their own pace.

On December 23, 1977, this Court issued findings of fact and conclusions of law (Memorandum of December 23, 1977, 446 F.Supp. 1295) which found that the defendants were violating the constitutional and statutory rights of the Pennhurst Class by failing to provide them with minimally adequate habilitation in the least restrictive environment.

Based on the evidence presented at the trial of this case, the Court found that Pennhurst in 1977 was overcrowded and understaffed and without the programs which the experts considered necessary for minimally adequate habilitation. The evidence showed that a large number of Pennhurst residents had actually experienced a regression of basic living skills as a result of their confinement at Pennhurst. Programming and training of the retarded Pennhurst residents was found to fall short of the minimum required for adequate habilitation according to the uncontradicted expert testimony of habilitation professionals. 446 F.Supp. at 1304. Not only was the habilitation then inadequate, but Penn-

hurst had no plans for improving the programming available to its residents. 446 F.Supp. at 1305.

The evidence presented at trial clearly showed that Pennhurst residents were not only receiving inadequate habilitation but also were regularly subjected to a number of dehumanizing practices. Specifically, this Court found that at Pennhurst restraints were used as control measures in lieu of adequate staffing. 446 F.Supp. at 1306. The Court further found that psychotropic drugs at Pennhurst were used for control and not for treatment, and that the rate of drug use on some of the units at Pennhurst was extraordinarily high. 446 F.Supp. at 1307. Regarding treatment at Pennhurst, the Court found that the environment at Pennhurst was not only not conducive to learning new skills, but it was so poor that it contributed to the loss of skills already learned. 446 F.Supp. at 1308. One survey showed that more than one-third of the Pennhurst residents had "some notation of regression in their records." 446 F.Supp. at 1308, n. 40. Pennhurst, at the time of trial, was in fact a dangerous place to live: "Injuries to residents by other residents and through self-abuse, were common.... In addition, there [was] some staff abuse of residents." 446 F.Supp. at 1308–09. The Court also found that many of the residents suffered physical deterioration and intellectual and behavioral regression during their residency at Pennhurst. 446 F.Supp. at 1309.

This Court held: (1) when a state involuntarily commits a retarded person, it must provide habilitation that will afford a reasonable opportunity to acquire such skills as his or her capabilities will permit, and that due process requires that once a state undertakes the habilitation of a retarded person it must do so in the least restrictive setting consistent with his habilitative needs; (2) that because the retarded persons had been physically abused, their constitutional right to be free from harm had been violated; (3) that retarded persons have the constitutional right to non-discriminatory habilitation and that Pennhurst residents had been segregated in an institu-

tion that was not only separate, but was not equal, thus denying their equal protection rights guaranteed by the 14th Amendment; (4) similarly, that Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), which provides that no handicapped person shall be excluded from any program receiving federal aid because of his handicap, had been violated; (5) that the Pennsylvania Mental Health/Mental Retardation Act of 1966, 50 Pa.Stat.Ann. § 4201 (Purdon 1969), which provides that the Department of Public Welfare shall have the power and duty to assure availability of adequate mental retardation services, gives retarded persons a statutory right to minimally adequate habilitation. In effect, this Court provided our Circuit Court with several reasons for upholding its order that the retarded residents of Pennhurst should be transferred to community living arrangements.

On January 6, 1978, this Court held a hearing to determine the injunctive relief necessary to remedy the violations. The parties were asked to attempt to agree on the terms of the Court's order, but no agreement was forthcoming. On March 17, 1978, the Court issued an injunctive Order setting forth the relief to which the retarded residents of Pennhurst were entitled: an appropriate community living arrangement and all necessary support services. The Court ordered that Individual Habilitation Plans be developed for each member of the plaintiff class, that appropriate community monitoring mechanisms be designed and implemented, that a friend-advocate system be established to represent those class members who were without family or guardian, and that a Special Master be appointed to monitor the defendants' planning and implementation activities and report to the Court on the defendants' compliance with the Court's orders.

During the course of this litigation, questions were raised concerning the appointment of a Special Master, whose primary function was to monitor the implementation of the Court's remedial decree. The Court wishes to point out, however, that this was the only occasion where this Court has ever determined it necessary to appoint a Special Master. The retarded residents of Pennhurst for the most part were unable to articulate their complaints concerning violations of the Court's orders. They were not a class capable of enunciating complaints concerning noncompliance with the injunction. This Court needed someone at Pennhurst who would observe and report violations of its orders.

This Court's judgment was appealed to the Third Circuit. It was determined that the entire court should sit en banc and decide the appeal. Nine judges sat; Judge Gibbons wrote the majority opinion. 612 F.2d 84 (3d Cir.1979) (en banc). The majority opinion held that the Developmentally Disabled and Bill of Rights Act, 42 U.S.C. § 6010, provided mentally retarded persons with a right to adequate treatment. This Act was not considered by the trial court. The Court of Appeals held that the Pennhurst residents had standing to sue to enforce the Bill of Rights provision set forth in the Act, and, on this basis, determined that this Court's injunctive order should be affirmed with some exceptions. The Court of Appeals stated that on remand this Court should engage in a présumption in favor of placing individuals in community living arrangements, but that "the special needs and desires of individual patients must not be neglected in the process," and suggested that this could be handled by the appointment of a Master. 612 F.2d at 115. The majority opinion commented on each of the five grounds which this Court had offered as a basis for its holding, but stated that the preferred order was to turn first to the federal statutory issues and then to the state statutory issues before considering the constitutional questions. Commenting on this Court's finding of constitutional violations, the Circuit Court stated that while there was substantial case law supporting this Court's position, the Circuit's resolution of the controversy on statutory grounds obviated the necessity for consideration of the constitutional issues. 612 F.2d at 130.

This Court, pursuant to the Third Circuit's remand order, established an impar-

tial hearing procedure and appointed a Hearing Master to provide the individual determinations mandated by the Circuit Court.

On April 20, 1981, the United States Supreme Court, in an opinion written by Justice Rehnquist, reversed the judgment of our Circuit Court on the ground that the Developmentally Disabled Assistance and Bill of Rights Act established a federal grant program which was voluntary for the States and that the Act did not create any substantive rights for retarded persons. 451 U.S. 1, 31, 101 S.Ct. 1531, 1546–47, 67 L.Ed.2d 694 (1981). The opinion also held that the Act did not make granting rights to retarded persons a condition to receiving money from the federal government under the Act. The Supreme Court remanded the case to the Circuit Court to address (1) the federal constitutional claims; (2) the claims under the Pennsylvania statute and (3) the claims under Section 504 of the Rehabilitation Act of 1973.

On February 26, 1982, our Circuit Court, pursuant to the Supreme Court's remand, issued its second *en banc* decision, which again affirmed the judgment of this Court, holding that the Pennsylvania Mental Health/Mental Retardation Act of 1966, 50 Pa.Stat.Ann. §§ 4101–4704, (Purdon 1969), granted to Pennsylvania's retarded citizens the right to adequate habilitation in the least restrictive environment. 673 F.2d 647 (3d Cir.1982) (en banc).

The Supreme Court again granted certiorari and after two oral arguments, reversed the judgment of the Third Circuit on January 23, 1984. 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). In a five to four decision, the Court held that the Eleventh Amendment barred a federal court from ordering prospective injunctive relief against state officials on the basis of violations of state law, even where the state law claims were properly brought into the federal court under pendent jurisdiction. *See* D. Shapiro, *Wrong Turns: The Eleventh Amendment and the Pennhurst Case*, 98 Harv.L.Rev. 61 (1984). Once again the Supreme Court remanded to the Court of Appeals for a determination of the remaining federal statutory and constitutional issues.

While the case was pending (for the third time) before the Court of Appeals, the parties entered into settlement negotiations conducted by the Honorable Max Rosenn, Senior Circuit Judge of the Third Circuit. On July 12, 1984, the parties executed a Final Settlement Agreement. By Order dated July 20, 1984, the Third Circuit remanded the case to this Court for proceedings pursuant to Fed.R.Civ.P. 23(e). By Order of August 8, 1984, this Court directed that all members of the plaintiff class, and their parents and guardians, be notified of the Final Settlement Agreement pursuant to the notification provisions of Appendix C of the Agreement; that any objections to the Agreement by any member of the plaintiff class, or any party, be filed with the Clerk of Court and mailed to all counsel no later than September 18, 1984; and that a hearing on the proposed settlement would be held in accordance with Rule 23(e) on September 25, 1984.

On September 25, 1984, a hearing on the proposed settlement was held before this Court. Subsequent to that hearing, at the request of the Commonwealth defendants, this Court deferred a decision on the approval or disapproval of the proposed settlement while the parties discussed the effect of unanticipated federal funding cutbacks upon the viability of the settlement. At a final hearing held in December, 1984, counsel for the Commonwealth defendants, all the County defendants, the plaintiff class, intervening plaintiff P.A.R.C., and intervening plaintiff United States of America recommended that this Court approve the settlement.

*The Settlement Agreement*

Currently there are approximately 435 residents remaining at Pennhurst, compared to 1,154 residents at the time this Court's community placement orders became effective in March of 1978. In November of 1983, prior to the second remand from the Supreme Court in this case, the Commonwealth of Pennsylvania announced that it intended to close Pennhurst (the

same intention expressed by the Commonwealth at the trial of this case in 1977). The Settlement Agreement provides that the Commonwealth will close the Pennhurst State School and Hospital by July 1, 1986, and never again will that institution be used as a residential facility for retarded persons.

Under the terms of the proposed settlement, the Commonwealth and County defendants have agreed to provide community living arrangements to those members of the plaintiff class for whom such placement is deemed appropriate by the individual planning process, together with such community services as are necessary to provide each person with minimally adequate habilitation, until such time as the retarded individual no longer is in need of such living arrangements and/or community services. The defendants agree to provide residential and habilitative services to all persons who have been furnished with such services pursuant to prior orders of this Court. The defendants agree to develop and provide a written habilitation plan, formulated in accordance with professional standards, to each member of the plaintiff class; provide an individualized habilitation program to each member of the plaintiff class; and permit each class member and his family or guardian to be heard in connection with his or her program. The defendants also agree to provide an annual review of each person's individualized habilitation program, and to monitor the services and programs provided to the class members in accordance with a detailed, professionally-established monitoring and visitation procedure. All defendants shall assure that all persons provided with services under the terms of the agreement shall be afforded: (1) protection from harm; (2) safe conditions; (3) adequate shelter and clothing; (4) medical, health-related, and dental care; (5) protection from physical and psychological abuse, neglect, or mistreatment; (6) protection from unreasonable restraint and the use of seclusion; and (7) protection from the administration of excessive or unnecessary medication. Furthermore, the agreement mandates that no

retarded person shall be transferred from Pennhurst solely to meet a timetable.

The agreement also provides:

1. The Commonwealth defendants will make available, in fiscal year 1984–85, $43.5 million (an amount approximately equal to that expended to operate Pennhurst in fiscal year 1982–83), to be expended on the following purposes, in the following order of priority:

a. The continued operation of Pennhurst for those still there;

b. The maintenance of community services for those persons placed in the community pursuant to orders of the district court;

c. The creation of community placements and services for persons presently residing at Pennhurst at a rate designed to allow the closing of Pennhurst by July 1, 1986;

d. The creation of community placements and services for 100 residents of Selinsgrove and Ebensburg Centers;

e. The creation of community placements and services for approximately 83 individuals residing in or from the five defendant counties who are not presently at Pennhurst;

f. The creation of community placements and services for additional individuals residing in the five defendant counties who are not presently at Pennhurst.

2. The Commonwealth defendants will make available, in fiscal year 1985–86, $43.0 million to be expended on the following purposes, in the following order of priority:

a. The continued operation of Pennhurst for those still there;

b. The maintenance of community services for those persons placed in the community in 1983–84 pursuant to orders of the district court and in 1984–85 except those 100 residents of Selinsgrove and Ebensburg placed in the community in 1984–85;

c. The creation of community placements and services for persons still resid-

ing at Pennhurst at a rate designed to allow the closing of Pennhurst by July 1, 1986;

d. The maintenance of community placements and services for 100 residents of Selinsgrove and Ebensburg Centers placed in 1984–85;

e. The creation of community placements and services for approximately 32 individuals residing in or from the five defendant counties who are not presently at Pennhurst;

f. The creation of community placements and services for additional individuals residing in the five defendant counties who are not presently at Pennhurst.

3. The Commonwealth defendants will make available, in fiscal year 1986–87, sufficient funds to maintain community programs and services for all individuals placed in the community pursuant to the settlement and the prior orders of the district court, and will also fund the Special Management Unit in an amount sufficient to allow it to carry out its functions. Should there be funds available to them from the amounts referred to in the previous paragraphs in excess of that required for the purposes stated in the previous sentence, Commonwealth defendants will use those funds for the provision of community services for individuals with retardation.

It should be noted that this settlement in no way *limits* the Commonwealth's provision of habilitative and residential services for retarded persons throughout Pennsylvania who are *not* parties to this action.

The functions of the Hearing Master are to be discontinued upon approval of the settlement. In place of the Hearing Master, an independent neutral retardation professional, agreed upon by the parties to be William A. McKendry, shall be retained by the Commonwealth. Mr. McKendry served for many years as mental retardation program administrator for Chester County, and is well-acquainted with the history of this litigation. As the independent retardation professional, he is charged with the review of any aspect of a transitional individual habilitation plan raised by objection of the class member, County, Commonwealth, parent, advocate, or plaintiffs' counsel. He must also conduct a review of the plan and render a final and binding decision in accordance with the procedures set forth in the settlement agreement.

The Settlement Agreement provides that the definition of the plaintiff class shall be amended. The plaintiff class, as previously certified by this Court, was defined as follows:

All persons who as of May 30, 1974, and at any time subsequent, have been or may become residents of Pennhurst State School and Hospital. The members of the class are persons resident at Pennhurst State School and Hospital, persons residing in Bucks, Chester, Delaware, Montgomery and Philadelphia Counties who are on a waiting list for placement at Pennhurst State School and Hospital, and persons residing in Bucks, Chester, Delaware, Montgomery and Philadelphia Counties, who, because of the unavailability of alternate services in the community, may be placed at the Pennhurst State School and Hospital.

The amendment set forth in the settlement agreement provides that persons who are on the waiting list for placement at Pennhurst (and who have not received any habilitative services under any prior orders of this Court), as well as those persons who "may be placed" at Pennhurst, shall no longer be considered members of the plaintiff class, and that their claims shall be dismissed pursuant to Fed.R.Civ.P. 41 without prejudice to their asserting any claims which they may have in any court of competent jurisdiction.

Finally, the settlement agreement directs that this Court shall retain jurisdiction until July 1, 1989, and that as of that date this action shall be marked closed, provided, of course, that at that time all defendants are in compliance with the agreement.

*Notice of and Objections to Proposed Settlement*

Pursuant to Fed.R.Civ.P. 23(e), a Notice of Settlement (setting forth a summary of the settlement agreement and procedures

for comment or objection) was personally served upon the 435 class members residing at Pennhurst at that time. Notices were mailed to the last known address of 1,065 class members who no longer reside at Pennhurst but who were Pennhurst residents for some period between May 30, 1974 and the time of notification (August 1984). Notices were also mailed to the 1,924 class members who were on the Pennhurst waiting list as of March 17, 1978. Notices were also mailed to the last known address of the family, guardian, or advocate of each of the class members described above. A total of 6,671 notices were mailed or personally served.

Fifty-three objections, on behalf of some sixty persons, were filed with the Clerk prior to the hearing held on September 25, 1984. Of the 435 current Pennhurst residents, objections were filed on behalf of 34 persons, or 7.8% of that portion of the class. Of the 1,065 former Pennhurst residents in the class, objections were filed on behalf of 9 persons, or 0.85% of that portion of the class. Of the 1,924 class members on the Pennhurst waiting list as of March 17, 1978, objections were filed on behalf of 17 persons, or 0.88% of that portion of the class. General objections were filed by counsel for the Parents-Staff Association, which earlier in this litigation had been granted leave to intervene. The total number of objections received—approximately sixty—represents 0.89% of the total number of notices served on class members and their families/guardians.

The objections to the settlement fall into two broad categories. The first of these are the concerns—familiar to this Court— of family members of Pennhurst residents (and in one case from the resident herself) who object to relocating their relative from Pennhurst to the community. These objectors typically perceive Pennhurst as offering its residents more security, familiarity, and services than may be found in the community living arrangements, and it is their opinion that, for a variety of reasons, an institutionalized environment is more appropriate than community placement for their family member. Approximately twenty-five of the objections received by this Court fall into this category, as do objections on behalf of seven persons who expressed dissatisfaction with recent transfers of family members from Pennhurst to a community living arrangement.

The second general category includes eighteen objections filed on behalf of persons on the Pennhurst waiting list, expressing objection to the redefinition of the plaintiff class to exclude persons on the waiting list. A number of these objections—approximately six—were filed on behalf of persons who express satisfaction with their current community placement and who request confirmation that under the terms of the settlement their community services will not be terminated. The balance of these objectors express fear that exclusion from the waiting list might disrupt funding either for their current placement in other institutions, or for community living arrangements not yet established.

Of the remaining (approximately eight) objections, several express concern over funding uncertainties with respect to the entire settlement, while others express concern over various aspects of the proposed placement procedures or monitoring process.

At the hearing on September 25, 1984, two members of the plaintiff class testified. Eight persons testified on behalf of family members. In addition, testimony was received from Dr. Robert W. Curtis, a mental health and retardation professional who expressed some reservations concerning the proposed settlement on behalf of the parents-Staff Association. Finally, the Court received the testimony of Dr. James Conroy, the Director of Research of the Developmental Disabilities Center at Temple University, who reported the results of a longitudinal study designed to determine, through a variety of measurements, whether retarded persons transferred from Pennhurst to community living arrangements pursuant to this Court's orders are "better off" in the community than they were at Pennhurst.

*Analysis of the Settlement*

The approval or disapproval of a class action settlement is left to the sound discretion of the trial court, which must determine whether the proposed settlement is fair, adequate, and reasonable. *Walsh v. Great Atlantic & Pacific Tea Co.*, 726 F.2d 956 (3d Cir.1983). The Third Circuit has identified nine factors generally relevant to the court's determination of the adequacy, fairness, and reasonableness of a proposed settlement. *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975) (citing *City of Detroit v. Grinnel*, 495 F.2d 448 (2d Cir. 1974)). The factors relevant to a proposed class settlement involving no money fund or determination of damages include (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the risks of establishing liability; and (5) the range of reasonableness of the settlement in light of all the attendant risks of the litigation. *Girsh v. Jepson*, 521 F.2d at 157.

The Third Circuit has stated that "[w]e review the district court's application of [the fair, adequate, and reasonable] standard only for abuse of discretion," and that

> [g]reat weight is accorded [the] views [of the trial judge] because he is exposed to the litigants, and their strategies, positions, and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly.

*Walsh v. Great Atlantic & Pacific Tea Co.*, 726 F.2d at 965, quoting *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 34 (3d Cir.1971). In this light, the Court will proceed to evaluate the settlement agreement and the reactions of the parties to the settlement.

The reaction of the class to the proposed settlement has been considered. As noted above, fifty-three objections, on behalf of some sixty persons, were filed. This total represents approximately 0.89% of the 6,671 notices of the settlement which were mailed or served to class members and their families. Only 7.8% of that portion of the class currently residing at Pennhurst filed objections. Less than one percent of that portion of the class who are *former* residents of Pennhurst filed objections. Less than one percent of that portion of the class who were on Pennhurst's waiting list in 1978 filed objections. In light of the considerable controversy accompanying the history of this litigation, and the announced intention of the Commonwealth to close Pennhurst, the number of objecting class members is remarkably small.

As noted above, the objections fall into two broad categories. One group of objections expresses concern or dissatisfaction with the redefinition of the plaintiff class to exclude those who were on Pennhurst's waiting list at the time the lawsuit was commenced. With respect to those "waiting list" class members currently receiving care, education, and training pursuant to prior orders of this Court, the settlement provides that they shall continue to receive such services. Furthermore, no class member currently on the waiting list has indicated that any funding which they or their families are receiving for other placements will be terminated by virtue of their exclusion from the class. The reason for initially including as class members all persons on the Pennhurst waiting list as of May 30, 1974, was to protect persons who actually were at risk of being sent to Pennhurst. Many (if not most) of the persons on the "waiting list" were not awaiting admission to Pennhurst. Their names were placed on the Pennhurst waiting list as a requirement for the receipt of funding which had been made available to provide financial aid to families who were paying for habilitation of a retarded family member in private institutions. It has never been this Court's intention to interfere in any manner with such funding procedures. *See* N.T., *Exceptions Re: J.B.N.*, January 17, 1983, at 30–31. Furthermore, over the past eleven years of this litigation, it has become apparent to the Court that this so-called "waiting list" included the names of many persons who were not seeking habilitative care in facilities provided by the Common-

wealth of Pennsylvania and the five defendant counties. Over the past eleven years, those who did seek such habilitation had it provided for them pursuant to orders of this Court. As counsel for the parties have pointed out, although the amended definition of the class does exclude those who were on the Pennhurst waiting list and who have not been subject to prior orders of this Court, their exclusion does not in any way prejudice their right to seek habilitation from the Commonwealth and the five defendant counties in the event that, at some date in the future, they determine that they are in need of such services. The Court finds that the eleven-year-old Pennhurst waiting list has outlived its usefulness in this litigation.

Objections also were received from present Pennhurst residents (or family members of present residents) who objected to relocating from Pennhurst to the community. These objections, most of which were filed on behalf of long-time residents of Pennhurst, express concern about leaving "familiar surroundings." There is no question that those who have resided at Pennhurst for many years will have difficulty adjusting to their new surroundings. Moving is a traumatic experience for most older people, even those who are not retarded. However, such transfers can be accomplished with a minimum of disruption by employing a program of pre-placement visits in order to afford an opportunity for them to become familiar with their new living arrangements. The Court is well aware that many of the Pennhurst residents will encounter an emotional reaction to a new life outside the institution. However, the Court finds that with care and sensitivity, such transfers can be accomplished without harm to the individual.

The Court also received objections from the Pennhurst Parents-Staff Association. Its basic objection appears to be that Pennhurst should not be closed. The Court well understands that those members of the staff presently employed at Pennhurst are not happy with the prospect that their employment will be terminated with the closing of Pennhurst. In its Order of March 17, 1978, this Court evidenced its under-

standing of their problem by ordering the formulation of a plan to provide alternative employment. This portion of the Court's Order, however, was set aside by the Third Circuit on appeal.

The Parents-Staff Association also has expressed genuine concern that the monitoring procedures provided in the settlement agreement may not be as effective as the present Court-ordered procedures in assuring adequate habilitation to members of the plaintiff class. The Court shares this concern but, as will hereafter be discussed, under the terms of the settlement agreement this Court will retain jurisdiction at least until July 1, 1989, for the purpose of assuring compliance with the terms of the settlement. The Parents-Staff Association has, within the last few years, become a forceful advocate for the rights of retarded persons, and the Court therefore is confident that the Parents-Staff Association will continue its vigilance.

The Court is well aware of the concerns expressed as to the availability of future funding to implement the terms and provisions of this settlement. The Court is reasonably certain that since the parties are in agreement and are vitally concerned with the implementation of this agreement, their sincerity and determination will be sufficiently persuasive to the sources of funding, particularly since the studies have shown that closing Pennhurst and transferring its retarded residents to the community will be considerably less costly than providing them with adequate habilitation at Pennhurst.

The Court notes that the parties' choice of William A. McKendry as the Independent Retardation Professional is an excellent choice. This Court has had the opportunity to observe the performance of Mr. McKendry in his capacity as the mental retardation program administrator for Chester County, wherein he displayed the expertise and sensitivity which well qualify him for the duties which he now assumes.

This Court would be remiss if it did not take this opportunity to express its gratitude to the present Hearing Master, Mi-

chael S. Lottman, who has performed the difficult tasks assigned to him as Hearing Master in an outstanding manner.

Finally, since the settlement agreement specifically provides that this Court shall continue to have jurisdiction concerning the enforcement of the settlement until the case is finally marked closed on July 1, 1989, and that the orders of this Court set forth in Appendix A of the settlement agreement shall have permanent force and effect, the Court has no hesitancy in finding that the settlement is fair, adequate, and reasonable.

The Court's paramount concern always has been whether the retarded residents at Pennhurst were receiving minimally adequate habilitation in the least restrictive environment. This Court never has hesitated to disapprove any practice or proposal which did not measure up to this concern. The Court has, in the words of the Third Circuit, been "on the firing line" in this litigation for more than eleven years, and in light of that experience and the evidence presented in support of the settlement, it has no hesitancy in approving this settlement.

Continued litigation of the constitutional as well as the state and federal statutory claims would not only be time-consuming and expensive, but when one considers that it has taken more than seven years of appellate review to reach this stage of the litigation, with none of the constitutional claims yet determined by the Court of last resort, it is certain that an ultimate conclusion to this litigation would not be reached in the immediate future. Furthermore, this litigation is now at the juncture where the parties are able to fully assess all the costs and risks of continued litigation.

In addition, the now-available empirical evidence has vindicated the opinions of the mental retardation experts that institutionalization cannot provide minimally adequate habilitation. During the course of this litigation, transfers from Pennhurst to community living arrangements have been successfully accomplished, and have enabled these individuals to enjoy a better life. The care, training, and education received by them in the community have enabled them to experience life as fully as their capabilities permit. Indeed, many parents and other relatives of retarded class members who were initially apprehensive and expressed objections to having their loved ones transferred from Pennhurst to a community living arrangement are now ardent supporters of community habilitation outside the institution of Pennhurst. The progress displayed by these former Pennhurst residents habilitated in the community has demonstrably altered the attitude expressed by their families toward community placement.

Systematic studies of the progress of retarded citizens receiving habilitation in community facilities show that the retarded residents of Pennhurst have made significant behavioral strides while in the community. In fact, all studies thus far presented to this Court show that Pennhurst residents placed in appropriate community living arrangements are, as each day passes, improving in habilitative skills. Their habilitation in the community stands in stark contrast to the finding in this record that an overwhelming number of the retarded at Pennhurst experienced a regression in life skills while at the institution. *See* 446 F.Supp. at 1308.

A 1981 study showed that former Pennhurst residents had, on average, exhibited an increase of nearly six points (on a 128-point scale) in their Behavior Development Survey (BDS) adaptive behavior score. *See* C. Feinstein, J. Lemanowicz, J. Conroy, *Progress of Clients in Community Living Arrangements: Class Members Compared to Others* (Sept. 19, 1981).

A 1982 Temple University Developmental Disabilities Center Study focused on habilitation in Chester County community facilities and found that former Pennhurst residents now residing in this community had exhibited a more than 15-point gain in their BDS adaptive behavior scores (on a 128-point scale) and an average .435 point gain in the BDS maladaptive behavior scores (on a 22-point scale; a higher BDS maladaptive behavior score indicates that the retarded

citizen shows less maladaptive behavior). This study also showed that these former Pennhurst residents now receiving community habilitation also exhibited substantial gains in life skills as measured by other tests generally accepted by the scientific community but less widely employed than the BDS adaptive and maladaptive behavior scores. *See* Temple University Developmental Disabilities Center Evaluation and Research Group. *Pennhurst Class Members in CLAs: Report # 2: Chester County Monitoring*, July 8, 1982.

A 1982 report commissioned as part of the *Longitudinal Study of the Court Order* begun by the U.S. Department of Health and Human Services in July, 1979 found that parental responses to questions concerning their view of their children's community habilitation "reveal a dominant pattern of extreme satisfaction with the quality and benefits of the community residences, tempered by deep concerns about the future security and permanence of the arrangements." J. Conroy and A. Latib, *Family Impacts: Pre-Post Attitudes of 65 Families of Clients Deinstitutionalized June 1980 to May 1982*, August 31, 1982. In particular, this report found that family attitudes toward community habilitation "changed sharply to more positive attitudes" toward community habilitation after these families had seen the progress made by their own children in community facilities. *Id.* at 8. Family satisfaction with community habilitation affected many aspects of family conduct. *Id.* at 14.

At the hearing on the settlement held on September 25, 1984, James Conroy, Director of Research of the Developmental Disabilities Center at Temple University, summarized the final results of the five year longitudinal study which systematically has tracked and monitored the progress of Pennhurst residents placed in community living arrangements (CLAs) under this Court's Orders. The purpose of the study was to measure each person's relative growth and development in the institution and the community, and to assess the impact of deinstitutionalization on their families. The findings are remarkable:

1. As measured by a variety of standards, former Pennhurst residents show significantly faster developmental growth in the CLAs than they did at Pennhurst.

2. Former Pennhurst residents receive more services and program time in CLAs than they did at Pennhurst (an average of ten hours per day compared to six at Pennhurst).

3. Prior to the transfer of a resident from Pennhurst into a CLA, over 60% of families surveyed opposed relocation, with 64% strongly disagreeing with the decision to transfer. Six months after the relocation of their relative to the CLA, the same families overwhelmingly approved of the decision: over 80% agreed with the decision (64% strongly agreed), and only 4% still strongly disagreed with the decision.

4. Following relocation to a CLA, families perceived their relatives' general happiness—as measured by a variety of standards—to be much greater in the CLA than at Pennhurst.

5. The expenditure of public dollars per resident was less in the CLAs than in Pennhurst.

Dr. Conroy testified that the results of the five year longitudinal study overwhelmingly demonstrated that those persons transferred from Pennhurst to a CLA pursuant to this Court's orders were "better off in every way." *See* Conroy, J.W., and Bradley, V.J., *The Pennhurst Longitudinal Study: A Report of Five Years of Research and Analysis*, Temple University Developmental Disabilities Center (Philadelphia 1985).

This settlement is more than just a termination of litigation; it is the beginning of a new era for retarded persons. It is a confirmation that all parties to this litigation are now in complete agreement that the retarded citizens of this Commonwealth have a right to care, education and training in the community. It is a recognition by the Commonwealth and its Counties that retarded persons are not subjects to be warehoused in institutions, but that they are individuals, the great majority of whom

have a potential to become productive members of society.