**Terri Lee HALDERMAN, et al.,**

v.

**PENNHURST STATE SCHOOL & HOSPITAL, et al.**

**No. CIV. A. 74–1345.**

United States District Court, E.D. Pennsylvania.

Feb. 9, 1998.

David Ferleger, Philadelphia, PA, for plaintiffs.

Judith A. Gran, Public Interest Law Center of Philadelphia, Philadelphia, PA, for plaintiff-intervenors The ARC–PA (formerly the Pennsylvania Association for Retarded Citizens), et al.

Robert H. Stern, U.S. Dept. of Justice, Civil Rights Div., Washington, DC, for plaintiff–intervenor U.S.

Jerome J. Shestack, Barry M. Klayman, Wolf, Block, Schorr and Solis–Cohen LLP, Philadelphia, PA, for defendant Com. of Pennsylvania.

Stephen C. Miller, Law Dept., Philadelphia, PA, for defendant County of Philadelphia.

### MEMORANDUM

BRODERICK, District Judge.

In the Court's Memorandum of April 5, 1985 approving the settlement of this class action and the entry of a consent decree, it was optimistically declared that "The concluding chapter of this litigation is at hand." It was therefore with great regret that on March 28, 1994 the Court was required to find, after a hearing, that defendants Commonwealth of Pennsylvania ("Commonwealth") and the County of Philadelphia ("Philadelphia") were blatantly failing to provide *Pennhurst* class members from Philadelphia with minimally adequate habilitation and protection from harm in violation of the 1985 Court Decree. Rather than imposing fines, however, the Court ordered the Commonwealth and Philadelphia to use their re-

sources to make certain that each class member received the habilitation and protection mandated by the Decree. The Court also set forth contingent coercive fines of at least $5,000 per day in the event that the Commonwealth and Philadelphia failed to remedy their substantial non-compliance by the deadlines imposed by the Court.

In the spring of 1994, the Court appointed a Special Master to oversee and report to the Court concerning the actions to be taken by the Commonwealth and Philadelphia to remedy their contempt. The Special Master has performed in an outstanding manner by achieving the cooperation of both the Commonwealth and Philadelphia to bring about the changes necessary to provide Philadelphia class members with the habilitation mandated by the Court Decree. The Court has not had to impose any fines or penalties in order to achieve compliance. Indeed, over the past four years the Commonwealth and Philadelphia have made significant strides towards fulfilling their obligations under the 1985 Court Decree and the 1994 Contempt Order. A "Quality Assurance Plan" to assure that class members receive adequate habilitation in the community is now in place. Plans for health care, employment, and investigation of abuse and other incidents are also in place. There is no doubt that Philadelphia class members are better off as a result of these efforts.

After reviewing the Commonwealth's and Philadelphia's record of compliance since 1994 and the Special Master's recent reports to the Court, the Court has determined that the Office of the Special Master should be phased out. At the behest of the Court, the Special Master has submitted a proposed schedule and methodology for terminating his supervision. The Commonwealth and Philadelphia have responded that they are fully committed to working with the Special Master to achieve substantial compliance with the Court's Orders by June 30, 1998. The defendants' recent commitment to their obligations to the *Pennhurst* class is markedly different from 1994, when the Court found them in contempt. The Court welcomes a speedy conclusion to the participation of the Court and the Special Master in monitoring the Commonwealth's and Philadelphia's ef-

forts to achieve substantial compliance with the 1985 Court Decree.

Although the Court has previously stated that it intended to conclude the Special Master's supervision on December 31, 1997, the Court agrees that a few more months are necessary for the Special Master to conduct a comprehensive individual review of approximately 110 randomly selected class members in order to determine whether the Commonwealth's and Philadelphia's efforts to achieve substantial compliance are actually providing each Philadelphia class member with the habilitation, training, and care mandated by the 1985 Court Decree. By Order dated today, the Court will direct the Special Master to conduct this review and to submit a report of his findings to the Court by June 30, 1998. The Court is hopeful and confident that the Special Master's final review in the upcoming weeks will reveal few, if any, deficiencies. Accordingly, it is the plan of this Court that on about June 30, 1998, the Court will rule that the Commonwealth and Philadelphia are in substantial compliance with the 1985 Court Decree and are purged of all contempt determined in this Court's Order of March 28, 1994.

## I. BACKGROUND

This action began in 1974 with the filing of a class action seeking to vindicate the constitutional and federal and state statutory rights of persons with mental retardation at Pennhurst State School and Hospital ("Pennhurst") in Spring City, Pennsylvania, approximately thirty miles northwest of Philadelphia. The members of the *Pennhurst* class are persons with mental retardation who resided at Pennhurst on or after May 30, 1974. As this Court has stated numerous times over the years, mental retardation is an impairment in learning capacity and adaptive behavior which is wholly distinct from mental illness. Mental retardation is not a violation of the law. Being mentally retarded does not make juveniles or adults dangerous to society. Mental retardation is not a disease. However, with proper habilitation in the community, the level of functioning of every person with mental retardation can be improved. "Habilitation" is a term of art used

to refer to the education, training, and care which will help those with mental retardation achieve their maximum development.

The Court has reviewed the history of this litigation in several opinions over the years. *See, e.g.,* 154 F.R.D. 594 (E.D.Pa.1994); 784 F.Supp. 215 (E.D.Pa.1992); 610 F.Supp. 1221 (E.D.Pa.1985); 555 F.Supp. 1144 (E.D.Pa. 1983); 545 F.Supp. 410 (E.D.Pa.1982); 446 F.Supp. 1295 (E.D.Pa.1977). As revealed by these opinions and by the official record, the history of this case can be broken down into five separate periods: (1) the trial, from 1974 to 1978; (2) the appeals and implementation of relief, from 1978 to 1984; (3) the class action settlement and consent decree, from 1984 to 1985; (4) the contempt proceedings, from 1987 to 1994; and (5) compliance with the contempt order, from 1994 to the present. Each period will be reviewed below.

A. *The Trial* (1974–1978)

On May 30, 1974, the plaintiffs brought a class action on behalf of residents of Pennhurst, a state institution founded in 1908 and dedicated by the Pennsylvania Legislature on June 12, 1913 to the "segregation ... of epileptic, idiotic, imbecile or feeble-minded persons." In 1975, the United States of America intervened as a plaintiff. Also in 1975, the Pennsylvania Association for Retarded Citizens (formerly "PARC" but now "The ARC–PA") and additional class representatives intervened as plaintiffs. Named as defendants were Pennhurst; the superintendent and various employees of Pennhurst; the Pennsylvania Department of Public Welfare; and various officials from the state and counties of Bucks, Chester, Delaware, Montgomery, and Philadelphia responsible for supervising the Commonwealth's and the counties' mental retardation programs. On November 26, 1976, the Court certified the case as a class action, the definition of which was later amended to include all persons with mental retardation who resided at Pennhurst on or after May 30, 1974.

Plaintiffs claimed that their institutionalization at Pennhurst violated their constitutional rights under the First, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, as well as their rights under the following federal and state statutes: the Rehabilitation Act of 1973, § 504 (current version at 29 U.S.C. § 794 (1985)); the Developmentally Disabled Assistance and Bill of Rights Act of 1975, § 111 (current version at 42 U.S.C. § 6009 (1995)); and the Pennsylvania Mental Health and Mental Retardation Act of 1966, § 201, 50 P.S. § 4201 (Purdon's 1969). Plaintiffs sought damages and broad equitable relief, including individualized habilitation and the relocation of all class members from Pennhurst into their communities.

At the time of the lawsuit there were approximately 1,230 persons with mental retardation at Pennhurst, reduced from a high of nearly 4,000 in the early 1960s. The average age of Pennhurst residents was thirty-six, and their average stay at the institution was twenty-one years. Staff numbered approximately 1,500. Despite improvements in the 1960s and early 1970s, Pennhurst was typical of large, isolated state residential institutions for persons with mental retardation. Forty-three percent of Pennhurst residents had no family contact within the past three years. Residents slept in large, overcrowded wards, spent their days in large day rooms, and ate in large group settings. There were few programs designed to increase their skills.

On December 23, 1997, after a thirty-two day trial, this Court issued findings of fact and conclusions of law which found that the defendants had violated the constitutional and statutory rights of *Pennhurst* class members by failing to provide them with minimally adequate habilitation in the least restrictive environment. *Halderman v. Pennhurst State School & Hospital,* 446 F.Supp. 1295, 1313–1324 (E.D.Pa.1977) (subsequent history omitted). Testimony had revealed that Pennhurst provided such a dangerous, miserable environment for its residents that many of them actually suffered physical deterioration and intellectual regression during their stay at the institution. *Id.* at 1308 & 1318. Indeed, none of the defendants disputed that Pennhurst as an institution was inappropriate and inadequate for the habilitation of persons with mental retardation, and that its residents should be educated, trained, and cared for in their communities. The defendants insisted, however, that the Common-

wealth be permitted to close Pennhurst and place the residents in the community at its own pace. *Id.* at 1313.

The Court issued five holdings, in effect giving the Court of Appeals several reasons for upholding its decision. First, the Court held that Pennhurst residents had a constitutional right to be provided with minimally adequate habilitation in the least restrictive environment consistent with their habilitative needs, and that the Commonwealth and five county defendants had violated this right. *Id.* at 1314–20. Second, the Court held that the defendants had violated class members' right to be free from harm, because they had been physically abused, injured, and inadequately supervised. *Id.* at 1320–21. Third, the Court held that persons with mental retardation have a constitutional right under the equal protection clause of the Fourteenth Amendment to non-discriminatory habilitation, and that Pennhurst residents were being segregated in an institution that was not only separate, but also not equal. *Id.* at 1321–22. Fourth, the Court held that the defendants had violated class members' state statutory right to minimally adequate habilitation under the Pennsylvania Mental Health and Mental Retardation Act of 1966, § 201, 50 P.S. § 4201 (Purdon's 1969). *Id.* at 1322–23. Finally, the Court held that the defendants had violated class members' federal statutory right to non-discriminatory habilitation under Section 504 of the Rehabilitation Act of 1973 (current version at 29 U.S.C. § 794 (1985)). *Id.* at 1323–24.

In fashioning a remedy, the Court determined that there was no basis for awarding money damages because testimony had shown that, for the most part, the people responsible for running Pennhurst were dedicated employees faced with overwhelming staff shortages and institutional inadequacies. On March 17, 1978, the Court issued an injunctive relief order requiring the defendants to provide, *inter alia,* each class member with minimally adequate habilitation according to an individualized habilitation program. *Id.* at 1326–29. The Court also appointed a Special Master to monitor compliance and to oversee the orderly transition of class members from Pennhurst into suitable community living arrangements.

B. *The Appeals and Implementation of Relief* (1978–1984)

A lengthy appeal process followed, a summary of which is provided in this Court's Memorandum of April 5, 1985, *Halderman v. Pennhurst State School & Hospital,* 610 F.Supp. 1221, 1225–26 (E.D.Pa.1985). Briefly, the defendants appealed to the United States Court of Appeals for the Third Circuit, which substantially affirmed this Court's relief order on the basis of the Developmentally Disabled Assistance and Bill of Rights Act, § 111 (current version at 42 U.S.C. § 6009 (1995)). *Halderman v. Pennhurst State School & Hospital,* 612 F.2d 84 (3d Cir.1979) (en banc). On the first appeal to the United States Supreme Court, the Supreme Court reversed and remanded for consideration of the statutory and constitutional issues decided by the trial court. *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). On remand, the Court of Appeals again affirmed, this time on the basis of the Pennsylvania Mental Health and Mental Retardation Act of 1966, 50 P.S. §§ 4101–4704 (Purdon's 1969). *Halderman v. Pennhurst State School & Hospital,* 673 F.2d 647 (3d Cir. 1982) (en banc). After hearing argument on two separate occasions, the Supreme Court reversed, ruling five to four that the Eleventh Amendment barred a federal court from ordering prospective injunctive relief against state officials on the basis of violations of state law, even where the state law claims had been properly brought into the federal court under pendent jurisdiction. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The Supreme Court remanded the case to the Court of Appeals a second time for consideration of the federal statutory and constitutional issues.

It is with fond memory that this Court recalls Justice Stevens' dissent, with whom Justices Brennan, Marshall and Blackmun joined. Justice Stevens wrote:

This case has illuminated the character of an institution. The record demonstrates that the Pennhurst State School and Hospital has been operated in violation of state law. In 1977, after three years of litiga-

tion, the District Court entered detailed findings of fact that abundantly support that conclusion. In 1981, after four more years of litigation, this Court ordered the United States Court of Appeals for the Third Circuit to decide whether the law of Pennsylvania provides an independent and adequate ground which can support the District Court's remedial order. The Court of Appeals, sitting en banc, unanimously concluded that it did. This Court does not disagree with that conclusion. Rather, it reverses the Court of Appeals because it did precisely what this Court ordered it to do; the only error committed by the Court of Appeals was its faithful obedience to this Court's command.

*Pennhurst,* 465 U.S. at 126, 104 S.Ct. at 922.

Between this Court's initial decision in 1977 and the Supreme Court's second opinion in 1984, this Court issued twenty-three published opinions and hundreds of orders implementing its original injunctive relief order. The Court denied several motions by the defendants to stay its judgment pending the appeals. *See, e.g.,* 526 F.Supp. 409 (E.D.Pa. 1981); 451 F.Supp. 233 (E.D.Pa.1978). On June 30, 1978, the Court appointed the first Special Master in this case, Robert H. Audette, who served until December 8, 1978 when he was replaced by Carla S. Morgan. Ms. Morgan served until the Office of Special Master was closed on December 31, 1982. *Halderman v. Pennhurst State School & Hospital,* 545 F.Supp. 410 (E.D.Pa.1982). Pursuant to the Third Circuit's mandate, this Court also appointed an impartial Hearing Master, Michael S. Lottman, to make individual placement determinations for class members or their families who contested their removal from Pennhurst. Mr. Lottman served from April 24, 1980 until the Office of the Hearing Master was closed on April 30, 1985.

The Commonwealth opposed the operation and funding of the masters' offices. Initially, the Commonwealth paid the costs of the masters' officers for fiscal years 1978–79, 1979–80, and 1980–81. However, the Commonwealth deliberately refused to provide full funding for fiscal year 1981–82. On August 25, 1981, after appropriate hearings, the Court found the Commonwealth in contempt for failing to make the required monthly payments for the masters' offices. *Halderman v. Pennhurst State School & Hospital,* 533 F.Supp. 631 (E.D.Pa.1981). The Court reiterated its finding, previously affirmed by the Court of Appeals, that the masters' offices were needed to monitor compliance with the Court's Orders and to oversee the orderly transfer of class members from Pennhurst into community living arrangements. The Court levied fines of $10,000 per day for each day the Commonwealth refused to comply with the Court's Orders funding the masters' offices. Throughout 1981, the Commonwealth chose to remain in contempt but paid the fine of $10,000 each day. Finally, the Court purged the Commonwealth of contempt in view of the fact that the state had paid fines totaling more than $1.2 million, an amount in excess of what was needed to fund the masters' offices. *Halderman v. Pennhurst State School & Hospital,* 533 F.Supp. 641 (E.D.Pa.1982).

The county defendants also struggled to comply with the Court's Orders. Placement of class members from Pennhurst into community living arrangements was occurring at a very slow pace. *Halderman v. Pennhurst State School & Hospital,* 555 F.Supp. 1144, 1145 (E.D.Pa.1983). In the first two years after the Court's judgment, the population of Pennhurst declined by less than 200 residents. *Id.* at 1153. Thus, on March 2, 1981, almost three years after the Court had issued its first injunctive relief order, the Court was compelled to enter an order mandating the community placement of sixty-one Pennhurst residents by June 30, 1981 and another 350 residents by June 30, 1982. The Court arrived at these numbers from the defendants' own proposals. Nevertheless, some of the defendants still failed to comply with this most recent order. On September 11, 1981, after appropriate hearings, the Court found defendants Bucks County, Delaware County and Montgomery County in contempt for failing to make their initial placements by June 30, 1981. *Halderman v. Pennhurst State School & Hospital,* 526 F.Supp. 414 (E.D.Pa.1981). The Court declined to impose fines, however, since the counties had achieved substantial compliance with the March 2nd Order after a flurry of

activity immediately following the contempt hearing. *Id.* at 422.

### C. *The Settlement and Court Decree* (1984–1985)

In 1984, while the case was pending before the Court of Appeals for the third time after the Supreme Court's remand, the parties entered into settlement negotiations. On July 12, 1984, with assistance from the Honorable Max Rosenn of the Third Circuit Court of Appeals, the parties executed a "Final Settlement Agreement." The Court of Appeals remanded the case to this Court for consideration of the class action settlement pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

This Court reviewed and approved the settlement and entered a consent decree on April 5, 1985. *Halderman v. Pennhurst State School & Hospital,* 610 F.Supp. 1221 (E.D.Pa.1985) (the "Court Decree"). At that time, there were approximately 435 residents remaining at Pennhurst, compared to 1,154 residents when the Court issued its first injunctive relief order on March 17, 1978. *Id.* at 1226. Under the terms of the settlement, the Commonwealth agreed that it would close Pennhurst by July 1, 1986. In addition, the Court Decree requires the Commonwealth and county defendants to provide community living arrangements to class members, together with such services as are necessary to provide them with minimally adequate habilitation. The Court Decree also requires the defendants to develop and provide each class member with a written habilitation plan, formulated in accordance with professional standards; to provide each class member with an individualized habilitation program which is reviewed annually; and to permit each class member and his family or guardian to be heard in connection with his or her program. The Court Decree further mandates that the defendants monitor the services and programs provided to class members and take corrective action when necessary.

Two other provisions of the settlement agreement are worthy of note. First, the agreement provided that upon its approval, the functions of the Hearing Master would be discontinued. *Id.* at 1228. In place of the Hearing Master, the Commonwealth agreed to retain an independent retardation professional, William A. McKendry, to review class members' individual habilitation plans. Second, the settlement provided that the definition of the plaintiff class would be amended to include only persons who had resided at Pennhurst on or after May 30, 1974, when the lawsuit was commenced. Persons who had been on the waiting list for placement at Pennhurst (and who had not received any habilitative services under previous order of the Court), as well as persons who might have been placed at Pennhurst, were no longer included in the plaintiff class, and their claims were dismissed without prejudice pursuant to Rule 41 of the Federal Rules of Civil Procedure.

The Court had no hesitancy in approving the settlement agreement as fair, adequate, and reasonable. Of a total of 6,671 notices provided to class members and their families, only fifty-three objections were submitted prior to the Court's hearing on September 25, 1984. *Id.* at 1229. There were two broad categories of objections. One group of objections were filed on behalf of persons on the Pennhurst waiting list, who contested the redefinition of the plaintiff class to exclude them. The Court found that, over the course of the litigation, it had become apparent that the waiting list included the names of many persons who were not seeking habilitative care in facilities provided by the defendants. The Court found that the eleven-year-old Pennhurst waiting list had outlived its usefulness. *Id.* at 1231. The other set of objections, familiar to the Court by that point in time, were from family members of Pennhurst residents who objected to the relocation of their relatives from Pennhurst into the community. These families expressed concern about their loved ones leaving "familiar surroundings." The Court, however, ruled that class members could be transferred with little disruption by employing a system of pre-transfer visits so that class members became familiar with their new surroundings.

In approving the parties "Final Settlement Agreement" and entering the consent decree, the Court optimistically declared that "The

concluding chapter of this litigation is at hand." *Id.* at 1222.

### D. *The Contempt Proceedings* (1987–1994)

Pennhurst State School and Hospital finally closed on October 27, 1987. Even before the institution closed, however, the plaintiffs filed a motion for contempt and enforcement of the Court Decree entered just two years earlier. Additional motions followed, culminating in the Court finding in 1989 and again in 1994 that the Commonwealth and three of the five defendant counties were in contempt. During this period, the Court was also required to rebuke three separate attempts by the Commonwealth to avoid its obligations under the 1985 Court Decree.

On August 28, 1989, the Court issued its first contempt ruling, finding that Delaware County, Montgomery County, and the Commonwealth of Pennsylvania were not in substantial compliance with the Court Decree. *Halderman v. Pennhurst State School & Hospital*, 1989 WL 100207 (E.D.Pa. Aug.28, 1989). Plaintiff-intervenor The ARC–PA had initiated the contempt proceedings with the filing of two motions on March 24, 1989, subsequently joined by the other plaintiffs. After four days of hearings in the summer of 1989, the Court found Delaware County and the Commonwealth in contempt because sixty-eight of the 191 class members from Delaware County were not being provided with the habilitative services mandated by the Court Decree. These class members were being housed in large facilities, did not have individual habilitation plans, or were receiving inadequate habilitation and case management services. The Court also found Montgomery County and the Commonwealth in contempt because six of 200 class members from Montgomery County were not being provided with the required habilitative services.

Recognizing that there had been more than 1,200 class members at Pennhurst when the action was commenced, the Court declined to impose sanctions against any of the defendants. Empirical studies over the years showed that the majority of class members had achieved substantial gains in their life skills as a result of the defendants' actions under the Court's Orders. Thus, the Court determined that the Commonwealth and the two county defendants should be given additional time to achieve substantial compliance with the 1985 Court Decree. The Court ordered the Commonwealth and the counties to remedy their violations by March 1, 1990, and directed them to submit monthly reports on their progress.

The Third Circuit affirmed. *Halderman v. Pennhurst State School & Hospital*, 901 F.2d 311 (3d Cir.1990). Before the Third Circuit, the Commonwealth argued that this Court's jurisdiction had expired under the terms of the Court Decree before the Court issued its contempt findings. The Commonwealth further argued that the requirements imposed by the Court Decree were only moral rather than legal obligations. Finally, the Commonwealth argued that it was not liable for the counties' non-compliance because the Decree only required it to monitor compliance, and also because state law placed responsibility for community placements on the counties. The Court of Appeals rejected each argument. The Third Circuit agreed with this Court that the jurisdictional terms of the Decree specified only the cessation of "active supervision," after which this Court would "simply resort to the usual continuing jurisdiction that courts routinely exercise over their injunctions." *Id.* at 320. Furthermore, the Third Circuit determined that the settlement clearly referred to the obligations it imposed as "orders of the Court," not ethical commands. The Court of Appeals also agreed with this Court that the Commonwealth was jointly responsible with the counties for providing community services under the Decree, and that the Commonwealth's monitoring responsibilities included not only keeping track of the counties' compliance but also taking corrective action when necessary. *Id.* at 322–23.

Soon after the 1989 contempt proceedings, the Commonwealth made another attempt to avoid its obligations under the 1985 Court Decree. On August 19, 1991, the Commonwealth filed a motion to vacate the Court Decree, asserting that developments in constitutional law and federal statutory rights had undermined the legal predicates for the Decree. This Court denied the motion.

*Halderman v. Pennhurst State School & Hospital,* 784 F.Supp. 215 (E.D.Pa.1992). Guided by the then-recent Supreme Court decision in *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), the Court determined that the Commonwealth, as the party seeking modification of an institutional reform consent decree, had failed to carry its burden of establishing a significant change in factual conditions or law which warranted revision of the Decree. *Halderman,* 784 F.Supp. at 224. The Court also found that there was no basis in law or equity for modifying the Decree, since several *Pennhurst* class members were still not receiving the services mandated by the Decree. The Third Circuit affirmed. *Halderman v. Pennhurst State School & Hospital,* No. 92–1186 [977 F.2d 568 (Table) ] (3d Cir.1992).

Having failed in 1989 and again in 1992 to avoid its obligations under the Decree, the Commonwealth embarked on yet another attempt with the filing of a motion on May 5, 1993. This time, the Commonwealth contended that the Eleventh Amendment required this Court to dismiss all plaintiffs except the United States from the action. This would have removed those parties directly affected by the Commonwealth's actions. The Court denied the motion, noting with dismay that it was just another attempt to delay full compliance with the settlement which the Commonwealth had knowingly and willingly entered eight years earlier. *Halderman v. Pennhurst State School & Hospital,* 834 F.Supp. 757, 759 (E.D.Pa.1993). The Court found that the Commonwealth had "unequivocally expressed" its consent both to suit and to be bound by the Court Decree. *Id.* at 763. The Court also rejected the Commonwealth's contention that class members were no longer entitled to care just because Pennhurst had finally been closed. *Id.* at 766. No appeal was taken.

Finally, on March 28, 1994, the Court issued its most recent contempt order, finding that the Commonwealth and Philadelphia had deliberately violated their obligations under the 1985 Court Decree. *Halderman v. Pennhurst State School & Hospital,* 154 F.R.D. 594 (E.D.Pa.1994). Plaintiff-intervenors The ARC–PA had initiated the contempt proceedings in November, 1987 against Philadelphia County. Later, the other plaintiffs joined in the motion, and the Commonwealth was added as a defendant upon Philadelphia's request. The Court granted several continuances to allow the parties to work out a settlement. Shortly after the filing of the motion, Philadelphia agreed to the appointment of an expert team, but negotiations failed. Then, in May, 1990, the parties agreed to the appointment of the third Special Master in this case, Dr. Sue Gant, for the purpose of reviewing Philadelphia's mental retardation programs. Dr. Gant filed a report with the Court in February, 1991 detailing numerous instances of noncompliance, and the Court set a hearing date on the contempt motion for June 13, 1991. *Id.* at 598.

Prior to the hearing, the parties again announced that they wanted time to settle the contempt motion. The parties proposed developing a comprehensive plan that would restructure Philadelphia's mental retardation programs to provide the habilitative services mandated for *Pennhurst* class members to all Philadelphia residents with mental retardation. *Id.* at 599. Although this Court's jurisdiction is limited to *Pennhurst* class members, the Court had no objection to the parties agreeing to extend the services provided to class members to all Philadelphia residents with mental retardation. In June, 1993, after two years of work, the parties advised the Court that they had developed such a plan. However, later that summer their agreement broke down, and the Court set another hearing date. The Court also directed the Special Master to update her February, 1991 report and to testify at the contempt hearing.

The Special Master's updated report concluded that the Commonwealth and Philadelphia were still not in compliance with the 1985 Court Decree. *Id.* The Court held hearings over a period of approximately nine days between December 1 and December 23, 1993. On the basis of the evidence presented at the hearings, as well as the Special Master's reports, the Court found that the Commonwealth and Philadelphia were not in substantial compliance with the Court Decree. The Court's findings of fact and conclusions

of law are detailed in the Memorandum of March 28, 1994. *Halderman v. Pennhurst State School & Hospital,* 154 F.R.D. 594, 599–610 (E.D.Pa.1994).

In summary, the Court found that the Commonwealth and Philadelphia had violated almost every substantive requirement of the 1985 Court Decree. At least thirty-three and as many as fifty-five *Pennhurst* class members from Philadelphia still resided in large institutional settings. As many as 25 percent of Philadelphia class members had no individual habilitation plan, and where a plan existed, it was not being properly implemented. The Court also found that the Commonwealth and Philadelphia had failed to adequately monitor class members in violation of the Court Decree. Approximately one-third of Philadelphia class members lacked case managers, and many of those who had been assigned a case manager did not receive regularly scheduled visits. Moreover, the defendants lacked an accurate, up-to-date listing of all class members from Philadelphia. Finally, the Court found that the defendants had failed to provide Philadelphia class members with adequate medical and dental care. Many class members were still being excessively treated with psychotropic or anti-seizure medications, and few class members had a primary care physician.

In fashioning a remedial order, the Court once again declined to impose fines. The Court issued a contempt order requiring the Commonwealth and Philadelphia to use their resources to ensure that each class member received the habilitation and protection from harm mandated by the 1985 Court Decree. The Court's order set forth fourteen affirmative requirements which the defendants had to meet by stated deadlines, or be subject to fines of at least $5,000 for each day they remained in non-compliance.

Shortly after the Court issued its contempt order, the Court appointed J.A. (Tony) Records of Takoma Park, Maryland to serve as Special Master to oversee compliance and implementation of the affirmative requirements in the Contempt Order. *Halderman v. Pennhurst State School & Hospital,* 1994 WL 185024 (E.D.Pa. May 12, 1994). The parties jointly proposed that Mr. Records replace the former Special Master, Dr. Sue Gant, who had testified against the Commonwealth and Philadelphia during the contempt proceedings. Appointed as the fourth Special Master in this action, Mr. Records has served from May 12, 1994 until the present. He and his staff have performed exceptionally well.

## II. BENEFITS TO *PENNHURST* CLASS MEMBERS AND ALL PERSONS WITH MENTAL RETARDATION

The *Pennhurst* case has brought numerous benefits to the plaintiffs in this class action as well as to other persons with mental retardation throughout Pennsylvania and the country. The *Pennhurst* litigation is widely credited with creating a general awareness that persons with mental retardation do have rights: the right to be free from abuse and mistreatment, the right not to be warehoused in institutions, and the right to receive habilitation and training. In short, the *Pennhurst* case stands for the principle that persons with mental retardation have the right to minimally adequate habilitation in the least restrictive environment.

*Pennhurst* has served as a model for deinstitutionalization litigation across the country. Between 1971 and 1996, there were seventy class action civil rights lawsuits filed on behalf of persons with mental retardation or other developmental disabilities. *See* Mary F. Hayden, "Class–Action, Civil Rights Litigation for Institutionalized Persons with Mental Retardation and Other Developmental Disabilities: A Review," 21 *Mental & Physical Disability L. Rept.* 411 (May–June 1997). Cases like *Pennhurst* have involved the right to live in the least restrictive environment; the right to adequate food, shelter, clothing, and medical care; and the right to adequate training and habilitation. Commenced in 1974, *Pennhurst* was the first such action filed in Pennsylvania and among the first eight cases filed nationwide. *Id.* at 411 & 421–23.

The deinstitutionalization movement has resulted in the vast relocation of persons with mental retardation out of large, state-operated institutions like Pennhurst into smaller, community facilities. In Pennsylvania, fourteen of the twenty-three large, state-operated institutions for persons with mental

retardation have closed since 1976, and two more are scheduled to close in the next two years. *See* R.W. Prouty & K.C. Lakin, *Residential Services for Persons with Developmental Disabilities: Status and Trends Through 1996* 30–31 (Table 1.12) (Minneapolis: University of Minnesota Research and Training Center on Community Living, May 1997). Over the past twenty years, the number of Pennsylvania residents receiving services for mental retardation has remained at approximately 16,000, but the number residing in institutions has dropped from 9,870 in 1977 to 3,164 in 1996. *Id.* at 170. The percentage of children in these institutions has also declined, from 23 percent in 1977 to less than 1 percent in 1996. *Id.* Over the same period, there has been a remarkable shift to small, residential settings. Today, 9,827 Pennsylvania residents with mental retardation live in homes of one to six persons, compared with only 1,078 in 1977. *Id.* Pennsylvania ranks fourth in the country in this regard, after California, Michigan, and New York. *Id.* at 55.

Nationwide, 131 of the 347 large, state-operated institutions for persons with mental retardation have closed as of 1996, and another twenty-one are scheduled to close by the year 2000. *Id.* at 20 (Table 1.11). The population of persons in these institutions has also declined, from an all-time high of 194,650 persons in 1967, to 151,532 persons in 1977, to 59,936 persons in 1996, or 26 percent of the 1967 total. *Id.* at 13 & 14 (Table 1.7). Correspondingly, the number of persons with mental retardation living in small, residential settings of one to six persons has jumped to 172,294 persons in 1996, compared with only 20,400 in 1977. *Id.* at 70 (Figure 2.5).

In the *Pennhurst* action, this Court has received empirical evidence that class members are better off in almost every way since leaving Pennhurst and receiving individualized habilitation in the community. In 1985, when the Court approved the parties' settlement agreement, the Court summarized the results of a five-year longitudinal study commissioned by the U.S. Department of Health and Human Services which specifically tracked the progress of Pennhurst residents under this Court's Orders. The study measured *Pennhurst* class members' relative growth and development in the institution vs. the community, and assessed the impact of deinstitutionalization on their families.

As summarized in the Court's Memorandum of April 5, 1985, the study's findings were truly remarkable:

1. Former Pennhurst residents showed significantly faster developmental growth in community living arrangements ("CLAs") than they did at Pennhurst.

2. Former Pennhurst residents received more services and program time in CLAs than they did at Pennhurst (an average of ten hours/day compared to six at Pennhurst).

3. Prior to transfers from Pennhurst into CLAs, more than 60% of families opposed relocation, with 64% strongly disagreeing with the decision to transfer. Six months after relocation, more than 80% of the same families agreed with the decision (64% strongly agreed), and only 4% still strongly disagreed.

4. Families perceived their relatives to be much happier in CLAs than at Pennhurst.

5. The expenditure of public dollars per resident was less in the CLAs than in Pennhurst.

*Halderman,* 610 F.Supp. at 1233 (citing J.W. Conroy & V.J. Bradley, *The Pennhurst Longitudinal Study; A Report of Five Years of Research and Analysis* (Philadelphia: Temple University Developmental Disabilities Center 1985)).

The most remarkable accomplishment of *Pennhurst* is the fact that so many class members are now employed. A recent telephone survey reveals that more than 50 percent of all *Pennhurst* class members participate daily in sheltered workshops or other activities for which they receive some compensation for their services. Additionally, there are almost one hundred class members who are employed in jobs where they earn at least the minimum wage. Other class members are regular volunteers in community programs for the elderly and other groups. Just a few days ago, an independent expert told the Court that he has been friendly with a *Pennhurst* class member whom he considers "the happiest person he knows." He said that this class member was committed to

Pennhurst when he was 7 years of age. He is now 66 years old and works every day in the kitchen of a college near Philadelphia.

Other class members have shown great improvement since leaving Pennhurst. For example, in 1977, after thirty-two days of testimony on the abominable conditions at Pennhurst, this Court wrote: "Terri Lee Halderman, the original plaintiff in this action, was admitted to Pennhurst in 1966 when she was twelve years of age. During her eleven years at Pennhurst, as a result of attacks and accidents, she has lost several teeth and suffered a fractured jaw, fractured fingers, a fractured toe and numerous lacerations, cuts, scratches and bites." *Halderman*, 446 F.Supp. at 1309. Today, the Court can happily report that Ms. Halderman lives in a one-level, ranch-style home with two roommates in Delaware County. Her home has a deck and a backyard where she enjoys the outdoors. She is in good health. She is provided with one-to-one staffing at all times, which enables her to participate in activities in the community during the day.

The improvement shown by another plaintiff is just as remarkable. In 1977, this Court wrote: "Plaintiff Linda Taub, who is blind in addition to being retarded, was admitted to Pennhurst in 1966 at the age of fifteen. According to her father, during her nine year residency at Pennhurst Linda received only custodial care and she experienced regression rather than growth. Time on the ward was spent sitting and rocking, with few activities. During one of their visits in 1968, Linda's parents found Linda, a person capable of walking, strapped to a wheelchair by a straightjacket. A staff member explained that by strapping her into the chair, they would know exactly where Linda was. While at the institution, Linda was badly bruised and scarred." *Id.* at 1310. Today, Ms. Taub lives in a home with five other women in Philadelphia and attends a day program. According to her most recent records, Ms. Taub has developed several independent living skills since moving to her present home. Although she is blind, she is able to move around in her home using trailing techniques. She has learned to dress herself. Ms. Taub has her own bedroom which she helps to maintain. At her day program, she completes some work for which she is paid, and a communication board has been developed to assist her with expressing her choices. In addition, Ms. Taub participates in community trips with staff members from her day program. She likes to attend concerts, swim and have manicures. Moreover, her individual habilitation plan includes goals to teach her to develop additional practical skills, such as making herself a snack.

The parties deserve to be proud of these and the other accomplishments they have achieved on behalf of the *Pennhurst* class. It must be recognized, however, that Pennsylvania residents with mental retardation who are not members of the *Pennhurst* class have not all received the same level of services. This is unfortunate. Throughout the entire history of this case, the Court has always encouraged the defendants to provide every person in Pennsylvania who has mental retardation with the minimally adequate habilitative services provided to the *Pennhurst* class. As this Court noted when it approved the Court Decree in 1985, the Court's orders in no way limit the defendants from providing habilitative and residential services to retarded persons throughout Pennsylvania who are not members of the *Pennhurst* class.

## III. COMPLIANCE WITH THE 1994 CONTEMPT ORDER (1994–present)

The Court has commended the Commonwealth and Philadelphia for their recent efforts in providing the services mandated by the 1985 Court Decree and 1994 Contempt Order. *See* 1997 WL 700490 (E.D.Pa. Nov.7, 1997); 1997 WL 538924 (Aug. 27, 1997); 1995 WL 605479 (E.D.Pa. Oct.13, 1995); 1995 WL 232509 (E.D.Pa. April 18, 1995). By Order dated March 12, 1997, the Court found that the Commonwealth and Philadelphia had consistently complied with several of the paragraphs of the Contempt Order, and purged them of contempt with respect to those requirements. The most recent reports from the Special Master and the Philadelphia defendants demonstrate how far the Commonwealth and Philadelphia have come since 1994.

There are currently 562 class members from Philadelphia, of whom nineteen are considered "inactive" because they refuse

services or cannot be located. The City's Department of Public Health keeps an alphabetical listing of each class member, along with his or her address and telephone number, residential provider, case manager, and most recent annual review date. In the City's most recent quarterly report (for the period ending December 31, 1997), it noted that seven Philadelphia class members had died since the last reporting period, and listed their names and date of death. Philadelphia's current efforts to keep track of class members stands in marked contrast to 1994, when the Court found that the defendants could not identify all of the members of the class. *Halderman*, 154 F.R.D. at 602.

The Court is also pleased to report that all but two active class members from Philadelphia now reside in small, community living arrangements ("CLAs"). Of the two individuals who remain in larger facilities, each has medical and/or psychological problems making it inappropriate to move them into CLAs at this time. In contrast, in 1994 the Court found that at least thirty-three and as many as fifty-five Philadelphia class members were residing in large institutional settings. *Id.* at 600.

Philadelphia class members are also now receiving the required levels of case management and monitoring services. As detailed in the Special Master's letter to the Court on February 21, 1997 and Philadelphia's most recent quarterly report, each class member has an assigned case manager. Moreover, there is currently at least one case manager for each 25 class members, and case managers receive both initial and continuing training. Finally, both the Commonwealth and Philadelphia have consistently monitored the day and residential programs used by class members. In contrast, approximately 32 percent of Philadelphia class members did not have case managers in 1994, and those who did were not visited on a regular basis. *Id.* at 602. Furthermore, the Court found in 1994 that the defendants' monitoring reports were woefully incomplete and inadequate, and that the defendants had failed to take corrective action when necessary. *Id.* at 602–04.

Each class member's medical treatment—including the prescription of psychotropic drugs—is now carefully recorded and monitored by his or her treating physician and by an independent physician employed by Philadelphia. The Special Master has advised the Court in his February 21, 1997 report that class members' medical records are consistently legible, complete, and present at their residential facility. Once again, the defendants' efforts stand in stark contrast to 1994, when the Court found that class members' medical records were either incoherent or non-existent, and that class members were being prescribed excessive psychotropic medication in violation of accepted medical standards. *Id.* at 604–05.

The Commonwealth and Philadelphia have also made significant strides in providing class members with minimally adequate habilitation in accordance with their individual habilitation plan ("IHP"). Philadelphia reports that all active class members in Philadelphia have current IHPs which are updated annually and completed within thirty days after the annual review. When two IHPs were mailed late during the last quarter, the City's Department of Public Health provided a reasonable explanation and identified the class members and length of delay. The Special Master will soon review whether class members are actually receiving the habilitative services specified in their IHPs.

In addition to improving their record of compliance, the Commonwealth and Philadelphia have also developed several comprehensive plans for the benefit of Philadelphia class members, such as an investigation plan, a medical and dental plan, a quality assurance plan, and an employment plan. Each one of these plans has been developed with input from the plaintiffs and the Special Master, and promises to assure that Philadelphia class members will receive continued habilitation after the Special Master completes his supervision.

The parties have developed an investigation plan, entitled the "Plan for the Investigation and Resolution of Incidents," to ensure that unusual incidents affecting the safety and well-being of class members are thoroughly investigated and promptly corrected when necessary. Initially approved by the Special Master on December 1, 1994, the investigation plan was revised on July 11,

1997 after an independent evaluation of how the plan was working. Under the terms of the plan, Philadelphia has established a new group called the "Pennhurst Investigation Unit," which includes a director, a senior investigator, and trained staff investigators who investigate allegations of abuse, neglect and/or theft of class members' property. These investigations are generally completed within sixty days from the time the incident is reported. Philadelphia has also issued revised policy guidelines to residential service providers governing the reporting and resolution of unusual incidents. The defendants should be commended for their development and consistent implementation of the investigation plan. These accomplishments represent a significant change from 1994, when incidents were usually self-investigated and the Court remarked that the investigative process was "akin to putting the fox in charge of the hen house." *Halderman,* 154 F.R.D. at 603.

The parties have also worked together to develop a health care plan for Philadelphia class members, entitled the "Comprehensive Health Care Plan for *Pennhurst* Class Members." This plan was approved by the Special Master on May 15, 1996 and took effect on May 31, 1996. The plan focuses on the smooth transition for class members from previous health care systems to managed care (HMOs, etc.). In addition, the health care plan includes several activities designed to ensure that managed care providers adequately respond to class members' needs in areas such as preventive and dental care, behavioral health, and elderly services. The health care plan also requires each class member's individual planning team to review and make recommendations regarding his or her health care at the annual review meeting.

Although the health care plan has not been fully implemented, it has thus far provided substantial benefits to Philadelphia class members. Each active class member in Philadelphia now has a primary care physician and a dentist. Moreover, as the Special Master has indicated in recent reports, Philadelphia's Health Care Coordinating Agency has assisted class members with enrolling in managed care systems and in training staff from managed care companies on the specific needs of individuals with mental retardation.

Class members, their families, case managers, and provider staff have all begun to receive training on health care issues. In an effort to ensure that class members are not being prescribed excessive psychotropic medication, the parties have developed new programs to enhance communication between direct contact staff, behavioral consultants, and psychiatrists. In addition, the Commonwealth and Philadelphia have established a fund to ensure that health care services which are not covered by insurance are made available to class members as needed. In the upcoming months, the Special Master will review whether Philadelphia class members are receiving the services provided for in the health care plan in a timely and effective manner.

In addition to an investigation and health care plan, the parties have also jointly developed a "Quality Assurance Plan" to establish a mechanism for sustained compliance with the Court's Orders once the Special Master concludes his supervision. This plan was approved by the Court on October 13, 1995. *Halderman v. Pennhurst State School & Hospital,* 1995 WL 605479 (E.D.Pa. Oct.13, 1995). The stated purposes of the plan are: to set out a vision of quality; to embrace the individual planning process as the foundation for all planning and monitoring efforts; to bolster the role and performance of case management through improvements in training and management of information; to define quality performance in a set of standards; to improve technical assistance to providers; to support coordinators and others through the development of a training institute; to revamp monitoring activities to connect and convey vital information with an emphasis on providing incentives to improve quality; to establish a dispute mediation process; and to evaluate implementation of the Quality Assurance Plan by an independent, outside source.

Although the Quality Assurance Plan is still being implemented, the defendants should be extremely proud of their accomplishments thus far. For example, the individual planning process has been modified to be more person-centered, and Philadelphia has revised its monthly case management

process so that relevant questions are asked and answered. Philadelphia has also added several positions to the Pennhurst Management Team, the entity responsible for ensuring the provision of supports and services to class members, such as a director of quality assurance, a director of training and technical assistance, and an assistant to the director. In addition, case managers and their supervisors now receive several days of competency-based training relevant to their positions. Philadelphia has also required each service provider to develop and submit a quality improvement plan. Finally, the Commonwealth has conducted annual compliance reviews under the Quality Assurance Plan and has requested Philadelphia to take corrective action when necessary.

The parties have also developed an employment plan for Philadelphia class members, entitled the "Plan for Increasing Access to Community Integrated Employment for *Pennhurst* Plaintiff Class Members." Although the parties have struggled with the timely development and implementation of this plan, the Special Master has helped the parties create a plan for person-centered services, training, and supports which gives *Pennhurst* class members from Philadelphia a real opportunity for employment and training. The employment plan is still in the very initial stages of implementation. There are currently thirty-five Philadelphia class members employed in positions paying at least the minimum wage, the majority of whom became employed within the past few years. Although this number is smaller than the Court would like, it confirms this Court's findings over the past twenty years that many persons with mental retardation can become productive, self-contributing members of society if given proper habilitation and training. Philadelphia class members now work for restaurants, car washes, retail grocery and merchandising stores, drug stores, and gas stations. They serve as clerical aides, baker's assistants, parking lot attendants, stock clerks, custodians, and maintenance workers. They work between three and forty hours each week, and earn from $5 to $10 per hour. This is truly a remarkable achievement compared with twenty-four years ago, when class members were isolated, abused, received no job training, and

faced institutionalization for life at Pennhurst.

## IV. DISENGAGEMENT: ENDING THE SPECIAL MASTER'S SUPERVISION

More than two years ago the Court expressed its intention to end its supervision of the Commonwealth and Philadelphia, the two remaining active defendants in this action. In approving the Philadelphia Quality Assurance Plan, the Court hoped that proper implementation of the plan would replace the need for continuing supervision by the Court and the Special Master. *Halderman v. Pennhurst State School & Hospital,* 1995 WL 605479 (E.D.Pa. Oct.13, 1995). The Court agreed at that time, however, that it was premature to set a schedule for phasing out the contempt proceedings.

Last spring, the Court determined that the time had come to conclude its own and the Special Master's monitoring of the Commonwealth and Philadelphia. Upon receiving the Special Master's proposed budget for 1997–1998, the Court directed the attorneys for the plaintiffs, the Commonwealth, and Philadelphia to appear at a conference in chambers on May 7, 1997. At the conference, the Court challenged the parties to focus their efforts on achieving substantial compliance with this Court's Orders so that supervision of the Commonwealth and Philadelphia could be completed. The Commonwealth suggested that the litigation could be concluded in six months if the Special Master worked with the parties and reviewed the Commonwealth's and Philadelphia's current efforts on behalf of Philadelphia class members. Welcoming this suggestion, the Court extended the Special Master's budget for six months, until December 31, 1997.

On August 5, 1997, the Special Master submitted his twenty-fourth report to the Court on the Commonwealth's and Philadelphia's record of compliance with the 1994 Contempt Order and 1985 Court Decree. In accepting the Special Master's report, the Court noted that his findings presented convincing evidence that substantial compliance was being achieved, and that the Court's goal of terminating the Special Master's supervi-

sion by December 31, 1997 was attainable. *Halderman v. Pennhurst State School & Hospital,* 1997 WL 538924 (E.D.Pa. Aug.27, 1997).

During the fall of 1997, the Special Master worked with the parties to develop a proposed schedule and methodology for reviewing whether the Commonwealth and Philadelphia were in substantial compliance with the 1985 Court Decree. On November 4, 1997, the Special Master submitted his proposal to the Court, and the Court directed the parties to file any comments they might have concerning the Special Master's proposed review. *Halderman v. Pennhurst State School & Hospital,* 1997 WL 700490 (E.D.Pa. Nov.7, 1997). Comments were received from the Commonwealth, Philadelphia, and each of the plaintiffs except the United States.

As heretofore discussed, it appears that the Commonwealth and Philadelphia have made great progress in complying with the 1985 Court Decree and 1994 Contempt Order. However, after reviewing the Special Master's proposal and the parties' comments, the Court has determined that a few more months are necessary for the Special Master to conduct a comprehensive review of individual Philadelphia class members for the purpose of determining whether they are actually receiving the services mandated by the Court Decree. Accordingly, by Order dated today, the Court will direct the Special Master to conduct this review and to submit a report of his findings to the Court by June 30, 1998.

In conducting his review, the Special Master will select a random sample of 20 percent of the Philadelphia class, approximately 110 class members. The Special Master will visit these class members at their homes and day programs and review their case files. He will interview these class members, their families, case managers, advocates, and direct care staff. The Special Master will also consult with each of the parties to discuss any deficiencies he may find and methods to correct them.

In order to devote the necessary time and attention to his review of approximately 110 Philadelphia class members, the Special Master may cease his ongoing, routine monitoring, including the submission of quarterly reports. The Court will direct the Special Master, however, to address any urgent issues regarding individual class members and to continue acting in his capacities under the various Court-approved plans. The Court will also extend the Special Master's budget, which expired on December 31, 1997, until June 30, 1998 at the same monthly level as last year. The Court anticipates that this will be the final budget approved for the Office of the Special Master.

## CONCLUSION

The past twenty years has seen a vast relocation of persons with mental retardation out of large, state-operated institutions like Pennhurst into small, community living environments. The *Pennhurst* case helped usher in this deinstitutionalization movement, and has brought a general awareness that persons with mental retardation have the right to minimally adequate habilitation in the least restrictive environment. Study after study has demonstrated that *Pennhurst* class members have been better off in almost every way since this Court ordered the defendants to provide them with care, training, and habilitation in smaller residential settings. Today, many class members are employed in paying jobs helping contribute to society. Others are acquiring new skills and learning to reach their maximum potential development.

Since 1994, the Commonwealth and Philadelphia—the two remaining active defendants in this action—have made significant improvements in providing *Pennhurst* class members from Philadelphia with the services mandated by the 1985 Court Decree and the 1994 Contempt Order. The Court has never imposed any fines or sanctions. After reviewing the Commonwealth's and Philadelphia's record of compliance and the Special Master's recent reports, the Court has determined that it is time to end the Court's and the Special Master's active supervision in this case. Accordingly, by Order dated today, the Court will direct the Special Master to conduct a comprehensive individual review of approximately 110 class members from Philadelphia for the purpose of determining whether they are actually receiving the ser-

vices required by the 1985 Court Decree. The Special Master will issue a report of his findings to the Court by June 30, 1998, and his budget will be extended through that date.

The Court sincerely hopes that the Special Master's report will not reveal any areas of substantial non-compliance. It is the Court's plan that the Special Master's office will be closed on June 30, 1998, and that the Court will then rule that the Commonwealth and Philadelphia are purged of all contempt found by this Court on March 28, 1994.

An appropriate Order follows.

### ORDER

AND NOW, this 9th day of February, 1998; the Court desiring to conclude the participation of the Court and the Special Master in monitoring the efforts of the Commonwealth of Pennsylvania ("Commonwealth") and County of Philadelphia ("Philadelphia") to achieve substantial compliance with this Court's Orders of April 5, 1985 (the "1985 Court Decree") and March 28, 1994 (the "1994 Contempt Order"); and for the reasons set forth in the Court's Memorandum of this date;

IT IS ORDERED:

1. The Special Master shall conduct a comprehensive individual review of approximately 110 randomly selected Philadelphia class members (20 percent) in order to determine whether the Commonwealth's and Philadelphia's efforts to achieve substantial compliance are actually providing each Philadelphia class member with the habilitation, training, and care mandated by the 1985 Court Decree. The Special Master shall file a report of his findings and recommendations with the Court by June 30, 1998.

2. In order to devote the necessary time and attention to his review of substantial compliance, the Special Master may cease his ongoing, routine monitoring, including the submission of quarterly reports required by this Court's May 12, 1994 Order, as amended January 3, 1996. The Special Master, however, shall continue, as necessary, to address urgent issues regarding individual class members and shall continue to act in the capacities which have been set forth for him in the various Court-approved plans.

3. The Special Master's budget, which this Court previously approved by Order dated May 8, 1997 and which expired on December 31, 1997, is extended through June 30, 1998 in the same monthly amount. On or before March 1, 1998, the Commonwealth and Philadelphia shall each submit a sum to the Clerk of the Court in the amount of $27,915.00 to cover the period of January 1, 1998 through March 31, 1998. Beginning on April 1, 1998, and on or before the first day of each succeeding month thereafter, up to an including, June 1, 1998, the Commonwealth and Philadelphia shall each deposit with the Clerk of the Court a sum in the amount of $9,305.00. In the event the Court determines that the Special Master's duties are completed as of June 30, 1998, any surplus funds on deposit with the Clerk's office will be refunded pro rata to the Commonwealth and Philadelphia; however, if the Court determines at any time that the Special Master will require supplemental funds, the Court may order the Commonwealth and Philadelphia to make additional deposits. To the extent not superseded by this Order, the Court's Order of May 12, 1994 *SHALL REMAIN IN FULL FORCE AND EFFECT*.