Teresa BALLARD *et al.* and Stephen Cain *v.*
Sheila MARTIN *et al.* and Westark Financial Consultants
of Jonesboro, Inc., *et al.*

01–1185 79 S.W.3d 838

Supreme Court of Arkansas
Opinion delivered July 5, 2002

*The Nixon Law Firm*, by: *David G. Nixon* and *Paige E. Young*, for Ballard appellants.

*Robert Cloar*, for Cain appellants.

*Orr, Scholtens, Willhite & Averitt, PLC*, by: *Chris A. Averitt, Jay Scholtens*, and *Kevin J. Orr*, for appellees Sheila Martin and Jimmie Sue Spencer, individually and o/b/o a class of similarly situated persons.

*Jones, Jackson & Moll, PLC*, by: *Jay W. Kutchka* and *Mark A. Moll*, for appellee Westark Financial Consultants of Jonesboro, Inc.

R OBERT L. BROWN, Justice. This is a check-cashing case that presents the issue of whether a class-action settlement was fair and adequate. The appellants are two groups of intervenors, Teresa Ballard *et al.* and Stephen Cain *et al.* (collectively referred to as Ballard and Cain). The appellees are Sheila Martin and Jimmie Sue Spencer, individually and on behalf of the class (collectively referred to as Martin), who represent the original class of plaintiffs in this litigation, as well as Westark Financial Consultants of Jonesboro, Inc. (Westark), together with eighteen other check-cashing businesses which voluntarily submitted to the jurisdiction of the Craighead County Circuit Court as defendants as part of Martin's amended motion for class certification (collectively referred to as Westark defendants). Westark and the other eighteen check-cashing businesses will be referred to jointly as "Westark appellees."

On appeal, Ballard and Cain challenge the fairness and adequacy of the class settlement between Martin and the Westark defendants. Ballard and Cain raise three additional points: (1) the adequacy of Martin, and class counsel to represent the interests of the class; (2) whether the trial court adequately enforced subpoenas against the Westark appellees; and (3) whether the notice to potential class members was adequate.

On December 8, 2000, Martin, both individually and on behalf of a class, filed the complaint against Westark in Craighead County Circuit Court. According to the complaint, each potential class member had engaged in deferred-presentment check-cashing with Westark. The typical deferred-presentment transaction allowed the customer to write a check for the cash amount exchanged plus a "service charge," which the check-casher would defer cashing until the customer's "payday." On payday, the customer was instructed to pick up the held check in exchange for cash in the face amount of the check. The customer could defer payment by writing a second check for the amount owed, the original service charge, and the new service charge. Martin alleged that these service charges were interest and that Westark had engaged in usurious lending practices in violation of Arkansas Constitution Article 19, section 13. She sought damages on that basis and alleged that the class met the requirements of Rule 23 of

the Arkansas Rules of Civil Procedure. On January 8, 2001, she also moved for class certification.

Following the filing of the complaint, Martin commenced discovery. Through one set of interrogatories and requests for production propounded by Martin, information about the arbitration provisions in the customer contracts was elicited. Martin did request limited information relating to Westark's financial condition. However, it is unclear from the record whether Martin ever received this information. The class was later estimated to include approximately 18,500 members. On April 26, 2001, Martin filed an amended motion for class certification in which the Westark defendants were added as parties defendant. Martin also filed a second amended complaint that same date with the Westark defendants listed as parties defendant.

Sometime in mid–to–late April 2001, Martin and the Westark appellees reached a settlement agreement. On April 30, 2001, the trial court entered an order certifying the class pursuant to Ark. R. Civ. P. 23, adopting the settlement, and requiring notice to the class by publication in the *Arkansas Democrat-Gazette* and by individual notices to be mailed no later than May 14, 2001. In the settlement, the eighteen Westark defendants agreed to submit to the jurisdiction of the Craighead County Circuit Court with Westark for purposes of settling all claims against them. The settlement was as follows: the nineteen check–cashing businesses would deposit $605,000 into a settlement pool. $435,000 of this amount would be used to purchase Series E bonds totaling $870,000 to pay the claims of aggrieved customers at a rate of one and one-half times any fees paid by those customers.[1] Claims exceeding the face amount of the bonds would not be paid. This settlement amount would be subject to set–off for any outstanding balance due the defendant check–casher for cash advanced and unpaid. The settlement amount, if any remained after the set-off, would be paid to

---

[1] The appellants assert for the first time on appeal that the United States Treasury discontinued Series E bonds in 1980, and thus the settlement agreement is impossible to perform as written. Martin responds that the class of bonds is now called Series EE instead of Series E, and that this oversight should not be a basis for invalidating the settlement. We agree.

the customer in the form of a Series E savings bond. The savings bonds were worth one-half of their face value until their maturity in sixteen years, and the class member was required to wait six months to cash the bond for the initial one-half value. Class counsel for Martin would immediately receive a fee of $170,000.

The settlement agreement further provided that the Westark appellees would continue to operate their businesses for the next ninety days after the date of the settlement in order to collect any outstanding checks. The settlement provided additionally that if any appellate court ruled that the service charges associated with these transactions were *not* usurious, then the defendants would be free to operate in any legal manner. The final "opt-out date" for nonparticipation in the class or settlement was fixed at August 15, 2001.

After this order was entered, notice was given to the class members together with the conditions of the proposed settlement. Martin accomplished notice by placing an advertisement in the *Arkansas Democrat-Gazette* newspaper on May 21, 2001. Class counsel also mailed an individual notification to each potential class member by standard mail on May 16, 2001.[2]

Two groups of objectors moved to intervene after receiving notice. The Ballard group of objectors involved five members and the Cain group of objectors involved twelve members. The Ballard objectors filed a motion to intervene on May 25, 2001. On that same date, they issued subpoenas for the financial records of the Westark appellees. The Cain objectors filed their motion to intervene on June 1, 2001. The trial court granted both motions to intervene on June 1, 2001, at the beginning of the fairness hearing on the proposed settlement.

At the fairness hearing, the trial court allowed the Martin class as well as the Westark appellees to put on evidence support-ing the settlement. The Martin class presented the testimony of Martin herself, as well as the testimony of Chris Lawson, a partner at the law firm of Friday, Eldredge, & .Clark in Little Rock. As

---

[2] Notice was mailed apparently two days after the May 14, 2001 date specified in the trial court's order. This two-day delay is not an issue on appeal.

class representative, Martin testified that she had been kept abreast of the litigation and had approved the settlement.[3] On cross-examination, she admitted to a lack of knowledge about some of the details of the litigation and the settlement agreement. For his part, Lawson testified that he was involved in class actions against check-cashing firms, and that he would advise any clients affected by the proposed settlement to remain in the settlement and not opt out.

The Westark defendants presented the testimony of one witness, Jeff Forsey, who testified in his capacity as the chief executive officer of fourteen of the Westark appellees and as custodian of financial documents for all nineteen Westark appellees. Forsey did not bring all of the subpoenaed financial documents with him but did appear in person at the fairness hearing. The Ballard intervenors moved to enforce the subpoenas, and the Westark defendants moved to quash them. The trial court ruled that Forsey's personal appearance and his partial production of financial records satisfied the subpoenas, considering how abbreviated the time was that the Westark defendants had to respond to the subpoenas.

On the stand, Forsey testified that the decision to enter into the settlement with the Martin class was a cost/benefit business decision for the Westark appellees. He further testified that the reason that they chose savings bonds as the method of payment was in hope that the settlement would foster "a different perspective on money" among the low-income class members. He added that the businesses he represented at the hearing would have difficulty producing the $605,000 to fund the settlement. On cross-examination, Forsey testified to the financial condition of the Westark appellees. Among other things, he testified that the receipts of the Westark appellees during the ninety-day period after approval of the settlement could exceed the settlement amount of $605,000.

On August 7, 2001, the trial court entered its final order approving the settlement. Ballard and Cain now appeal that order.

---

[3] The record does not reveal whether Jimmie Sue Spencer, the other class representative, was present at the fairness hearing.

## I. Fairness of the Settlement

Ballard and Cain first assert that the trial court abused its discretion when it approved the class settlement because the settlement was not fair, reasonable, and adequate. They urge this court, in measuring the fairness of the settlement, to adopt the Eighth Circuit Court of Appeal's standards set out in *Grunin v. Int'l House of Pancakes*, 513 F.2d 114 (8th Cir. 1975).

In *Grunin*, the Eighth Circuit adopted four factors to assist in assessing whether a class settlement is fair and adequate. Those four factors are listed below, with the first factor being the primary measure of fairness and the remaining three being secondary to the first:

(1) the strength of the case for the plaintiffs on the merits, balanced against the amount offered in the settlement;

(2) the defendant's overall financial condition and ability to pay;

(3) the complexity, length, and expense of further litigation; and

(4) the amount of opposition to the settlement.

*Grunin*, 513 F.2d at 124 (citing *West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1085 (2d Cir. 1971); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974); *Young v. Katz*, 447 F.2d 431 (5th Cir. 1971)).

The Eighth Circuit further stated in *Grunin* that the fairness of a class settlement is a discretionary matter that rests with the trial court, and an appellate court should not reverse a trial court's approval of a class settlement absent an abuse of its discretion. *Grunin*, 513 F.2d at 123 (citing Ace Heating & Plumbing Co. v. Crane Co., 453 F.2d 30 (3d Cir. 1971)). The *Grunin* Court quoted the *Ace Heating* case for the following proposition:

Such a determination is committed to the sound discretion of the trial judge. Great weight is accorded his views because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly.

*Grunin*, 513 F.2d at 123 (quoting *Ace Heating*, 453 F.2d at 34). The Eighth Circuit continued that the trial court is accorded deference, but that deference is accompanied by a duty to act as a fiduciary who must serve as guardian of the rights of absent class members. *Grunin*, 513 F.2d at 123 (citing *Greenfield v. Villager Indus., Inc.*, 483 F.2d 824 (3d Cir. 1973); *Norman v. McKee*, 431 F.2d 769 (9th Cir. 1970); *Percodani v. Riker-Maxson Corp.*, 50 F.R.D. 473 (S.D.N.Y. 1970), *aff'd sub nom. Farber v. Riker-Maxson Corp.*, 442 F.2d 457 (2d Cir. 1971)). It concluded that no court should accept a settlement that is unfair or inadequate, and the burden is on the proponents of the settlement to show that the proposed settlement meets standards of fairness and adequacy. *Grunin*, 513 F.2d at 123 (citing *City of Detroit v. Grinnell Corp.*, *supra*; *United Founders Life Ins. Co. v. Consumers Nat'l Life Ins. Co.*, 447 F.2d 647 (7th Cir. 1971); *Young v. Katz, supra*).

We adopt the *Grunin* factors and will proceed to analyze this issue using those factors.

*a. The strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.*

Ballard and Cain first argue that the plaintiff class's chance of success on the merits is great. They also point out the many differences between a possible litigation-generated recovery versus the settlement agreement, including differences in financial benefit to class members and differences to the future of the appellees' check-cashing businesses. They conclude that the likelihood of success on the merits versus the offered settlement weighs heavily in favor of this court's finding that the trial court abused its discretion.

*(i) Strength on the merits.*

█ We observe, as an initial matter, that this court has never directly spoken to the issue of whether the deferred-presentment transactions, such as we have in the instant case, are usurious and violate the Arkansas Constitution. However, many of this court's cases point to the strong constitutional policy against usury established by Article 19, section 13, of the Arkansas Constitution,

both before and after the adoption of Amendment 60 in 1982. Article 19, section 13, of the Arkansas Constitution states in relevant part:

> (a) General Loans:
> (i) The maximum lawful rate of interest on any contract entered into after the effective date hereof shall not exceed five percent (5%) per annum above the Federal Reserve Discount Rate at the time of the contract.
>
> * * *
>
> (b) Consumer Loans and Credit Sales: All contracts for consumer loans and credit sales having a greater rate of interest than seventeen percent per annum shall be void as to principal and interest and the General Assembly shall prohibit the same.

Ark. Const. Art. 19, § 13. *See also Luebbers v. Money Store, Inc.*, 344 Ark. 232, 40 S.W.3d 745 (2001) (citing this portion of Article 19, section 13, as potentially applicable to the transactions at issue, but not reaching the merits of the usury dispute). Historically, this court has closely scrutinized what appeared to be a non-usurious transaction on its face to reveal the true usurious nature of the transaction. *See Bunn Lumber Co. v. Weyerhaeuser Co.*, 268 Ark. 445, 598 S.W.2d 54 (1980) (finding transaction usurious where interest on account payable was masked as a service charge); *Arkansas Savings & Loan Ass'n v. Mack Trucks of Arkansas, Inc.*, 263 Ark. 264, 566 S.W.2d 128 (1978) (finding transaction usurious where interest on loan was masked as a pre-loan "commitment fee"); *Sosebee v. Boswell*, 242 Ark. 396, 414 S.W.2d 380 (1967) (finding transaction usurious where a forfeiture of money placed in escrow was actually interest, but was masked as liquidated damages, processing fees, and expenses); *Smith v. Eason*, 223 Ark. 747, 268 S.W.2d 389 (1954) (finding transaction usurious where interest on loan was masked as a commission payable to lender's agent); *Strickler v. State Auto Finance Co.*, 220 Ark. 565, 249 S.W.2d 307 (1952) (finding transaction usurious where interest on loan policy was masked as a service charge and pro rata share of overhead expenses); *Wilson v. Whitworth*, 197 Ark. 675, 125 S.W.2d 112 (1939) (finding transaction usurious where interest charges were masked as insurance and service fees). We conclude that for decades this court has been willing to delve into the particulars of

a financial arrangement to expose its usurious nature. As we said in *Sparks v. Robertson*, 66 Ark. 460, 463-64, 51 S.W. 460, 462 (1899), "The law shells the covering, and extracts the kernel. Names amount to nothing when they fail to designate the facts." As a result, it is obvious that the transactions presented in this case would receive exacting scrutiny if they were presented to this court for a merits determination.

Recently, this court rejected an attempt by the General Assembly to rename deferred-presentment interest as a non-usurious fee under Act 1216 of 1999, then codified at Ark. Code Ann. § 23-52-104(b) (Repl. 2000). *See Luebbers v. The Money Store, Inc.*, *supra*; (holding that the determination of what is interest and what is not interest is for the courts, not the legislature). *See also Strickler v. State Auto Finance Co.*, *supra* (holding statute unconstitutional as violative of separation of powers where General Assembly tried to deem installment loan fees as non-interest). The Westark appellees may have relied on Act 1216 of 1999 in proceeding to do business in this state. The effect of that reliance, if any, is an issue that has not been resolved by the courts of this state.

The Westark appellees argue that their agreements with their customers provide that any customer disputes must be resolved by arbitration. They note that at the time of the settlement negotiations, only the case of *Showmethemoney Check Cashers, Inc. v. Williams*, 342 Ark. 112, 27 S.W.3d 361 (2000), which held that the arbitration agreements at issue could not be enforced due to lack of mutuality of obligation, had been decided by this court. They further refer to the general release of claims signed by most of their customers as a defense against the class-action litigation. Finally, they advance a practical argument. They underscore the fact that eighteen of the nineteen Westark appellees voluntarily submitted to the venue of the Craighead County Circuit Court in order to take advantage of the terms of the settlement. Those eighteen defendants assert that despite their voluntary appearance, they have preserved an objection to venue in the trial court, should the settlement not be consummated. They further assert that if this settlement is thwarted, they will seek to withdraw from the jurisdiction of the Craighead County Circuit Court. If that hap-

pens, any success on the merits will be applicable only to Westark and not to the other eighteen Westark defendants.

The arbitration defense seems less valid today than it might have appeared on April 30, 2001, in light of this court's recent decisions. *See, e.g., The Money Place, LLC v. Barnes,* 349 Ark. 411, 78 S.W.3d 714 (2002); *Cash in a Flash Check Advance of Arkansas, LLC v. Spencer,* 348 Ark. 459, 74 S.W.3d 600 (2002); *E-Z Cash Advance, Inc. v. Harris,* 347 Ark. 132, 60 S.W.3d 436 (2001). In addition, this court has yet to consider the viability of the general-release defense. The point, according to the Westark appellees, is that had they not settled, they would have contested class certification based on these two defenses and appealed any adverse order.

■ Being mindful of this court's strong jurisprudence against usury as well as Article 19, section 13, of the Arkansas Constitution, we conclude that Ballard and Cain have a *bona fide* argument on the merits. However, we quickly add that by concluding as we do, we are not deciding the merits of the usury question in their favor. This distinction was noted by the *Grunin* court:

> [N]either the trial court in approving the settlement nor this Court in reviewing that approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute.

*Grunin,* 513 F.2d at 123 (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d at 456 (2d Cir. 1974)). Nor can we proceed in our analysis with any assumption that the class will prevail and collect all damages claimed. *Armstrong v. Board of School Directors,* 616 F.2d 305 (7th Cir. 1980).

*(ii) Potential litigation recovery compared to settlement.*

Ballard and Cain also contend that the settlement is inadequate, unfair, and unreasonable when compared to a likely recovery after litigation. They mount two primary arguments to support their position. The first concerns the monetary value of the settlement as opposed to a potential litigation recovery. The settlement agreement contemplates a cash outlay of $605,000 by the Westark defendants, including $170,000 in attorneys' fees.

The face value of the bonds available for claims is $870,000. Ballard and Cain claim that, in contrast, a damage recovery following litigation could be as high as $27 million, based on doubling the fees collected by the Westark appellees. They also emphasize that the $605,000 settlement is subject to a set-off for the amount of any outstanding cash advances owed by individual class members. In a litigated recovery, Ballard and Cain contend that those outstanding debts would be void as consumer loans under Article 19, section 13. Finally, they assert that it is unfair to distribute the settlement funds in the form of savings bonds which will not mature for sixteen years.

Ballard and Cain further point to the continuing viability of the Westark appellees following the settlement. They argue that under the terms of the settlement agreement, the defendant check-cashing establishments will be free to continue their businesses so long as they simply rename the transactions. For example, instead of calling the transactions "deferred presentment transactions," they claim the Westark defendants could rename the same transactions "pay-day loans" and still comply with the settlement. Indeed, they point out that Jeff Forsey, as CEO of fourteen of the nineteen Westark businesses, testified that he and his board of directors were looking into that very option. By contrast, Ballard and Cain assert that a victory on the merits following litigation would shut down the businesses permanently, either through a judgment that would bankrupt the corporations or through a judgment that concluded the business practices were unconstitutional.

The Westark appellees make three arguments in response. First, they argue that a settlement is always lower than a potential litigation recovery, because otherwise there would be no incentive to settle. They also claim that their ability to pay a larger sum is limited, and that a large jury verdict would be unrecoverable in any event, because the affected businesses would seek bankruptcy protection. Therefore, they assert that as a practical matter, litigation of the case would be futile. In addition, the Westark appellees cite *Petrovic v. Amoco*, 200 F.3d 1140 (8th Cir. 1999), for the proposition that once a trial court has determined that a settlement is

fair and adequate, the fact that a defendant could have paid more is not a legitimate reason to reject the settlement.

The Westark appellees' second argument is that the settlement contains a significant benefit to the class that Ballard and Cain do not discuss. Under the settlement, the class members would be able to write off any outstanding debt after the ninety-day period from the settlement date has expired. Thus, class members who did not make a claim under the settlement agreement would not face collection on their checks. Third, they argue that the settlement agreement hastens the class members' recovery and avoids the delays of litigation.

■ ■ While we are attuned to the legitimacy of the arguments made by Ballard and Cain, the Westark defendants also make valid points about their defenses. We recognize that the purpose of a settlement is to avoid the delay, expense, and risk of trial. *Grunin v. Int'l House of Pancakes, supra.* We further are reluctant to hold that this settlement does not fall within the range of reasonableness when compared to what the class might have ultimately recovered. A full recovery of $27 million based on collecting twice the amount of interest paid under section (b) of Article 19, section 13, of the Arkansas Constitution for all other loans is somewhat speculative, considering that the merits of their constitutional claim have never been decided. But even assuming full recovery, a settlement which embraces Series EE Bonds totaling $870,000 and forgiveness of debt after ninety days has considerable value. As one court has put it:

> While plaintiffs cannot predict what each claimant will receive, the Second Circuit has held that a settlement can be approved even though the benefits amount to a small percentage of the recovery sought. *Grinnell*, 495 F.2d at 455. "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself mean that the proposed settlement is grossly inadequate and should be disapproved." *Id.* (footnote omitted). The Court explained: "In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* at 455 n.2. In the District Court decision in *City of Detroit v. Grinnell Corp.*, 356 F.Supp. 1380,

1386 (S.D.N.Y. 1972), *aff'd in part, rev'd in part,* 495 F.2d 448 (2d Cir. 1974), Judge Charles Metzner of this Court found a proposed settlement of 3.2% to 3.7% of the potential recovery "'well within the ball park.'"

*In re Milken & Assoc. Securities Litigation,* 150 F.R.D. 46, 54 (S.D.N.Y. 1993). In short, we do not find this argument to be dispositive of the issue.

*b. The defendant's overall financial condition and ability to pay.*

■ To a lesser extent, the fairness of the class settlement turns on the Westark appellees' ability to pay more than the $605,000 to settle the matter under *Grunin.* Here, Ballard and Cain assert that Jeff Forsey's own testimony swings this factor in their favor. They point to his statement that during the ninety-day window alone, the Westark appellees could receive check-cashing revenues that exceed the value of the cash outlay— $605,000. They also claim that Forsey's testimony revealed such liquidity in the Westark appellees' businesses that a far greater settlement agreement could have been negotiated. According to his figures, the businesses were worth some $2.7 million as of December 31, 2000, after deducting bad debt that they would not be able to collect. The Westark appellees dispute these figures. They also claim that they have little cash on hand and that operating overhead reduces the amount available for the settlement fund. We do not consider the disputed claim that the Westark appellees could have paid more than $605,000 to be a persuasive reason for overturning the settlement.

*c. The complexity, length and expense of further litigation.*

■ The third factor in determining the fairness of a class settlement is the burden of litigating the case. This factor is also subordinate to the first factor but should still be considered in determining whether the trial court abused its discretion in approving the settlement. The Westark appellees emphasize that further litigation would have caused delay, and that delay would have caused more members of this low-income transient class to become lost due to relocation. They further point to the immedi-

ate benefit of a settlement versus the contingency of protracted litigation. We agree that this bird-in-the-hand argument militates in favor of the settlement.

### d. Opposition to the settlement.

 The fourth and final factor in determining the fairness and adequacy of a class settlement is the degree of opposition to the settlement. Again, this factor is less important than the first factor. The Westark appellees contend that only seventeen members of the approximately 18,500-member class objected. This is true. Accordingly, this factor also weighs in favor of the settlement. However, one court has sounded a note of caution in this regard:

> [A] low level of vociferous objection is not necessarily synonymous with jubilant support. In many class actions, the vast majority of class members lack the resources either to object to the settlement or to opt out of the class and litigate their individual cases.

*In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 217-18 (5th Cir. 1981). *See also Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, n.15 (3d Cir. 1993) (noting that absent class members "have an insufficient incentive to contest an unpalatable settlement agreement because the cost of contesting exceeds the objector's *pro rata* benefit").

 Again, it was the trial judge who was in the trenches and lived with this class litigation. He assessed the risk of litigation, the delay in recovery, the amount of recovery claimed versus the settlement that was struck, as well as the other *Grunin* factors, and concluded that the settlement was fair and reasonable. We accord the trial court deference in these matters and are unwilling to second-guess the decision based on the arguments presented by Ballard and Cain in this appeal.

### e. Collusion

 Though not a factor in the *Grunin* analysis, Ballard and Cain make the further charge of collusion between Martin

and the Westark appellees due to the fact that the settlement was reached before the class was certified. Other jurisdictions have held that when a settlement is entered into before a class is certified, the settlement should be subject to heightened scrutiny. *See, e.g., In re General Motors Corp. Pick-up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768 (3d Cir. 1995); *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141 (S.D. Ohio 1992). Though it is apparent that the settlement under review was hurried and ultimately global in the number of check-casher businesses involved, there is no proof that the settlement was not made at arm's length. There are definitely benefits accruing to the class in the form of reimbursements and debt forgiveness. The fact that the class could have gotten more does not translate into collusion. We affirm on this point.

## II. Adequacy of Class Representatives

Ballard and Cain next contend that Martin and Spencer were inadequate representatives to protect the interests of the class members and that Martin's class counsel was likewise inadequate.[4] This issue is decided by our recent case of *USA Check Cashers of Little Rock, Inc. v. Island*, 349 Ark. 71, 76 S.W.3d 243 (May 30, 2002). As we said in that case, we review a trial court's grant of class certification under an abuse-of-discretion standard. *See USA Check Cashers, supra.*

Rule 23(a) of the Arkansas Rules of Civil Procedure has as one of the four prerequisites to a class action:

> (4) the representative parties will fairly and adequately protect the interests of the class.

Ark. R. Civ. P. 23(a)(4). *See also BPS Inc. v. Richardson*, 341 Ark. 834, 20 S.W.3d 403 (2000). This court has previously interpreted that subsection to require three elements:

> (1) the representative counsel must be qualified, experienced, and generally able to conduct the litigation; (2) that there be no evidence of collusion or conflicting interest between the representa-

---

[4] At the fairness hearing, the adequacy of Martin as class representative was specifically attacked.

tive and the class; and (3) the representative must display some minimal level of interest in the action, familiarity with the practices challenged, and ability to assist in decision making as to the conduct of the litigation.

*Mega Life & Health Ins. Co. v. Jacola*, 330 Ark. 261, 275, 954 S.W.2d 898, 904 (1997). In a similar vein, this court has held that the element of adequacy is met if the class representative displays a *minimal* level of interest in the action, familiarity with the challenged practices, and the ability to assist in litigation decisions. *See Direct Gen. Ins. Co. v. Lane*, 328 Ark. 476, 944 S.W.2d 528 (1997).

 Martin testified at the fairness hearing that she was pleased with the legal representation provided to her and that her attorneys had kept her informed of what was going on in the case. She also stated that her goal in suing the defendants was to put an end to the check-cashing practices of the Westark appellees. She testified that she talks to her attorneys regularly and is kept abreast of the proceedings. Based on this testimony, we fail to discern any abuse of discretion in the trial court's finding that Martin is an adequate class representative.

 Furthermore, the allegation that the law firm of Orr, Scholtens, Willhite & Averitt is inadequate class counsel is meritless. These attorneys are currently handling a raft of cases against Arkansas check-cashing businesses. They have extensive class-action experience, and there is nothing to suggest that they are inadequate counsel for the class in this case. This court has held that absent a showing to the contrary, we presume that the class representative's counsel will vigorously and competently pursue the litigation. *See Mega Life & Health Ins. Co. v. Jacola, supra* (citing Herbert B. Newberg, *Newberg on Class Actions*, §§ 3.24, 3.42 (3d ed. 1992)).

We affirm the trial court on this point.

### III. Subpoenas

Ballard's third point, which Cain does not join, relates to the subpoenas for financial documents issued five days before the fairness hearing on June 1, 2001. Ballard sought full disclosure of the

Westark appellees' financial information in order to determine their ability to pay more than the settlement. At the hearing, the businesses, acting through CEO Forsey, only produced a portion of the financial documents sought. Nevertheless, the trial court ruled that this partial production, in addition to the personal appearance and testimony of Forsey, was sufficient in light of the short period of time that the companies had to respond. Ballard argues that this ruling was an abuse of the trial court's discretion. She points out that it was the short notice to the class—roughly two weeks before the fairness hearing—that prevented her from intervening sooner and from issuing subpoenas in a more timely manner.

It is boilerplate law that a trial court has broad discretion in matters pertaining to discovery, and the exercise of that discretion will not be reversed by this court absent an abuse of discretion that is prejudicial to the appealing party. *Loghry v. Rogers Group, Inc.*, 348 Ark. 369, 72 S.W.3d 499 (2002) (citing *Alexander v. Flake*, 322 Ark. 239, 910 S.W.2d 190 (1995); *Rankin v. Farmers Tractor & Equipment Co., Inc.*, 319 Ark. 26, 888 S.W.2d 657, (1994); *Jenkins v. Int'l Paper Co.*, 318 Ark. 663, 887 S.W.2d 300 (1994)). In the instant case, Ballard does not illuminate how she was prejudiced by the lack of additional financial information. Nor does she assert how her challenge to the settlement would have been different if she had obtained full compliance with the subpoenas. We note that Ballard did argue both to the trial court and to this court that total liability to the 18,500 class members was $27 million and that the Westark appellees would bring in more than $605,000 in revenue during the ninety-day period following the settlement date. Certainly, the financial information that she had on hand enabled her to fully mount her arguments against the settlement. In light of the fact that the subpoenas came less than a week before the fairness hearing, it was within the trial court's discretion to deem partial compliance sufficient. The trial court's ruling on this issue is affirmed.

## IV. Adequacy of the Notice

Ballard's and Cain's fourth point is that notice of class certification, the settlement, and the date of the fairness hearing to class

members was inadequate for two reasons. First, they maintain that the notice came too close in time to the fairness hearing itself to be effective. Secondly, they argue that the method of notifying the class—standard U.S. mail rather than first-class mail—was inadequate and, thus, did not meet the due process requirements of Rule 23.

Again we turn to the *Grunin* case for guidance on this point. Due process requires that notice of a proposed settlement be given to a class. *Grunin v. Int'l House of Pancakes, supra.* The notice given must be "reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 120 (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950)). The notice must also reasonably convey the necessary information about the settlement and give interested class members a reasonable opportunity to make their appearance and voice any objections. *Id.*

This court has addressed a related notice issue before. In *SEECO, Inc. v. Hales,* 334 Ark. 307, 973 S.W.2d 818 (1998), we said:

> The mechanics of notice to class members is left to the discretion of the trial court and is subject only to the reasonableness standard of due process. *See Grunin v. Int'l House of Pancakes,* 513 F.2d 114, 121 (8th Cir. 1975), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). Arkansas Rule of Civil Procedure 23(c) provides in part that "the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." The United States Supreme Court has made reference to the fact that the "best notice practicable" under Federal Rule 23 is individual notice. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Notice by publication is used to supplement individual notice when class members cannot be identified by reasonable efforts. *See Eisen v. Carlisle & Jacquelin, Id.*

*SEECO, Inc. v. Hales,* 334 Ark. at 312, 973 S.W.2d at 820-21. In *SEECO, Inc.,* this court held that notice given thirty days prior to the opt-out date was adequate under these standards.

■ In the case before us, Ballard and Cain claim that the notice was not timely mailed so as to afford due process protection. The notice was mailed on May 16, 2001, and the fairness hearing was held on June 1, 2001. A two-week notice period was simply too short, they claim. On this point, we note that courts have approved notices given to a class within a comparable period before the fairness hearing. *See, e.g., Grunin v. Int'l House of Pancakes, supra* (holding that notice sent out nineteen days before fairness hearing was not a violation of due process); *Armstrong v. Board of School Directors*, 616 F.2d 305 (7th Cir. 1980) (holding that notice sent out twelve days before fairness hearing was not a violation of due process). Further, the notice contained an opt-out provision which advised the class members that they *could always choose to opt out of the settlement so long as they did so by August 15, 2001.* Thus, class members had approximately three-months notice of the opt-out deadline. Opting out of the settlement gave them the recourse to pursue their own claims against the particular check-casher businesses with which they were involved.

■ There is also the point that Ballard and Cain had an opportunity to appear at the fairness hearing, because they did so through counsel. Ballard even issued subpoenas to the Westark appellees five days before the fairness hearing. Had the abbreviated notice hampered their ability to participate in the fairness hearing on June 1, 2001, it seems that the particulars on how they were handicapped would have been made known to the trial court or to this court.

■ Next, we consider the method of the individual mailing. In this case, individual notices were mailed to all potential class members by standard mail. Ballard and Cain, however, urge that due to the transient nature of this particular class, the notice should have been mailed first-class U.S. mail, so that the class members could take advantage of forwarding addresses, and class counsel could have undeliverable notices returned to them. We disagree. Martin, in her mailing to class members, claims that she requested return service for undeliverable notices at an additional cost. This was for the purpose of forwarding the notice to transient class members, according to Martin. Ballard and Cain reply that nothing regarding remailing returned notices to new addresses

is in the record. But what the record does support is that forwarding addresses were requested by Martin at an added cost which presupposes this was for the purpose of remailing. Though a forwarded notice may have been too late for the June 1 fairness hearing, it certainly was timely notice of the right to opt out of the class. Plus, notice of class certification, the settlement, and the opt-out date (but not the fairness hearing) was supplemented by published notice in the *Arkansas Democrat-Gazette*, a newspaper with statewide circulation, on May 21, 2001. Granted, published notice may not have been read by some members of the class, but we are unwilling to denigrate published notice completely as offering no due process protection. Because individual notices were sent and the notice was published in a newspaper with a statewide circulation, we conclude that the notice given comported with minimum standards of due process. We affirm the trial court on this point as well.

As a final point, we note that Ballard and Cain have asserted a number of other deficiencies in the notice, the terms of the settlement, and the adequacy of class counsel. Those arguments are as follows: the terms of the settlement are inadequate because the unclaimed funds revert to the Westark appellees; the terms of the settlement make no provisions for claimants with judgments pending against them or whose debts have been discharged in bankruptcy; class counsel was inadequate for failing to bring claims against the stockholders of the Westark appellees and their sureties; and the notice to the class was contradictory because it stated both that class members would still need to pay their unsatisfied debt and that collections would cease ninety days after the settlement date. These arguments are largely unsupported by authority and are not fleshed out in the briefs. None of them provides a convincing basis for holding that the trial court abused its discretion in approving the settlement. Furthermore, it is axiomatic that a settlement does not have to be perfect in order to be fair. *See, e.g., Joel A v. Giuliani*, 218 F.3d 132, 144 (2d Cir. 2000) ("[A] settlement agreement achieved through good-faith, non-collusive negotiation does not have to be perfect, just reasonable, adequate, and fair."); *Halderman v. Pennhurst State School & Hospital*, 610 F. Supp. 1221, 1222 (D.C. Pa. 1985) ("As with all things

of this world, the settlement is not perfect. It is, however, a fair, adequate, and reasonable settlement. . . .").

Affirmed.

GLAZE, J., not participating.